UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTIN LEWIS, ET AL., | No. C-08-02670 CW (JCS) |
| Plaintiffs, | |
| v. | **ORDER RE JANUARY 21, 2010 JOINT LETTER [Docket No. 213]** |
| WELLS FARGO & CO., | |
| Defendant. | |
| _____/ | |

## I.   INTRODUCTION

Plaintiffs in this wage and hour class action seek production of documents relating to the classification of class members as exempt or non-exempt that Defendants have withheld based on the work-product doctrine, attorney-client privilege and the self-critical analysis privilege.  Having considered the arguments of the parties raised in their January 21, 2010 joint letter ("Joint Letter") and reviewed, *in camera*, the 12 sample documents provided to the Court by Defendant (six of which were selected by Plaintiffs, and six of which were selected by Defendants, from Defendant's privilege log), the Court offers specific guidelines to be applied by Defendant in determining which of the documents listed on its  privilege log must be produced to Plaintiffs.

## II.   BACKGROUND

### A.   Documents at Issue

The discovery dispute before the Court arises out of Plaintiffs' requests for production of documents generated by Wells Fargo in connection with internal audits that were performed to determine whether various positions were properly classified as exempt ("reclassification audits").  In particular, according to Wells Fargo, its Law Department "initiated, directed, and performed and/or supervised" the following audits:

1. • FLSA/state law classification audit of the Technical Service Specialist 3 position (commenced January 22, 2004);

- FLSA/state law classification audit of Technical Service Specialist 4 position (commenced October 11, 2004);

- FLSA classification audit of Computer Operations Analyst 2 position (commenced October 10, 2005);

- FLSA/state law classification audit of Network Analyst 2, Network Engineer 3, Information Security 2 and Information Security 3 positions (commenced March 28, 2006);

- FLSA/state law classification audits of Application Systems Engineer 3, Computer Operations Analyst 3, Computer Operations Analyst 4, Database Analyst 2, Database Analyst 3, Operating Systems Analyst 2, Operating Systems Engineer 3, Systems QA Analyst 2, Systems QA Analyst 3, Web Engineer 2 and Web Engineer 3 (commenced 2007).

Joint Letter at 9; *see also* Declaration of Timothy Grubb ("Grubb Decl."), ¶¶ 2-3. The audits were conducted with the assistance of Wells Fargo's Compensation Group, which also maintained the documents that were created as a result of these audits. Wells Fargo withheld 2,037 of these documents, which were listed on a privilege log provided to Plaintiffs. *See* Joint Letter, Ex. 1 (privilege log).

Plaintiffs do not ask the Court to compel production of all of these documents. Rather, they seek "immediate production of all documents not authored by or addressed to Wells Fargo's counsel, because those documents cannot satisfy the attorney-client privilege, and were not created in anticipation of litigation (thus also failing to satisfy the attorney work product doctrine)." Joint Letter at 2.

**B.     Plaintiffs' Position**

Plaintiffs argue that Wells Fargo has acted improperly in withholding the documents described above for three reasons. First, Plaintiffs contends that Defendant's application of the attorney-client privilege doctrine is over-broad to the extent that Wells Fargo has asserted that privilege as to documents that were not sent to or from counsel but rather, were merely created at the request of counsel or to assist counsel, or where counsel is cc'ed on the communication. In support of this argument, Plaintiffs cite to *Flintkote Co. v. General Accident Assurance Co.*, 2009 U.S. Dist. LEXIS 44066 (N.D. Cal. May 26, 2009), in which the court held, according to Plaintiffs, that only

2

1 communications directly between the named attorneys and the party's officers could be redacted on
2 the basis of attorney-client privilege. In addition, Plaintiffs cite to *IP Co., LLC v. Cellnet*
3 *Technology, Inc.*, 2008 U.S. Dist. LEXIS 79776 (N.D. Cal. Aug. 18, 2008), in which a court held
4 that "merely copying an attorney on an email does not establish that the communication is
5 privileged." While Plaintiffs acknowledge that a communication between non-attorneys *may* be
6 privileged if it is clear that the recipient would have known it referenced an attorney communication,
7 they argue that this exception applies only if the document explicitly states that the purpose of the
8 communication is to assist counsel. As an example of this rule, Plaintiffs cite to *Deel v. Bank of*
9 *America*, *N.A.,* 227 F.R.D. 456 (W.D. Va. 2005), in which, Plaintiffs assert, communications that
10 were created as part of an FLSA review were not protected because they did not explicitly state that
11 the communications were for the purposes of obtaining legal advice and instead appeared to be
12 intended to assist the defendant in a business decision.

13 Second, Plaintiffs argue that the work product doctrine does not apply because these
14 documents were not created "in anticipation of litigation," as required to extend work product
15 protection to non-attorney communications. According to Plaintiffs, a general fear of litigation is
16 not enough to demonstrate "anticipation of litigation;" rather, "it is the pendancy of a *particular*
17 *legal action* that triggers work product." Joint Letter at 6 (citing *In re Grand Jury Subpoena*, 357
18 F.3d 900, 908 (9th Cir. 2003) (citing Wright & Miller § 2024)). Further, even where a party is facing
19 litigation, the document must have been created *because of* that litigation. Joint Letter at 5. Thus,
20 the relevant test is whether "the document was created because of anticipated litigation and would
21 not have been created in substantially similar form but for the prospect of litigation." Joint Letter at
22 5 (quoting *Hoot Winc, LLC v. RSM McGladrey Fin. Process Outsourcing, LLC,* 2009 U.S. Dist.
23 LEXIS 103045 at * 7 (S.D. Cal. Nov. 4, 2009)).

24 Plaintiffs assert that *Clarke v. J.P. Morgan Chase & Co*., 2009 U.S. Dist. LEXIS (S.D.N.Y.
25 April 10, 2009), illustrates the rule that documents must be created because of the anticipated
26 litigation rather than for some other reason, such as general compliance efforts. In that case, the
27 court held that an email sent from the employer's management team to managers whose employees
28

3

1 were going to be affected by upcoming FLSA changes was not protected under the work product
2 doctrine because the purpose of the email was to ensure compliance with the FLSA and avoid
3 litigation, indicating that the communication would have occurred, in much the same manner,
4 regardless of any anticipated litigation. *Id.* at *23.

5 Plaintiffs also rely on *Marceau v. IBEW Local 1269*, 246 F.R.D. 610, 614 (D. Ariz. 2007).
6 In that case, Plaintiffs assert, the court found that the work product doctrine did not apply to
7 documents generated as part of an audit that was conducted a year before litigation was initiated
8 because the audit was aimed at on-going management issues facing the company and not in
9 anticipation of litigation. According to Plaintiffs, a past history of litigation was not enough, in
10 *Marceau*, to satisfy the "anticipation of litigation" requirement. Similarly, Plaintiffs argue,
11 *Brantigan v. Deputy Spine, Inc.,* 2008 U.S. Dist. LEXIS 78052, at *9 (W.D. Wash. Sept. 12, 2008),
12 is an example of a case in which the court found that an audit conducted a year before litigation was
13 initiated was not "in anticipation of litigation."

14 Here, Plaintiffs assert, the only litigation cited by Wells Fargo, *Gerlach v. Wells Fargo*, is
15 not sufficient to give rise to anticipation of litigation because it occurred years ago and involved a
16 distinct population of employees. Moreover, they argue, many of the documents on Defendant's
17 privilege log appear to relate to routine compliance efforts that would have been undertaken
18 regardless of any pending or anticipated litigation and therefore do not fall under the work product
19 doctrine. Therefore, Plaintiffs assert, the non-attorney communications listed on Wells Fargo's
20 privilege log are not work product and should be produced.

21 Third, Plaintiffs assert that Defendant's reliance on the self-critical analysis privilege is
22 improper because that privilege has not been recognized by the Ninth Circuit. Plaintiffs note that in
23 the case cited by Wells Fargo in support of its assertion of this privilege, *Dowling v. American*
24 *Hawaii Cruises, Inc.*, 971 F.2d 423, 425 (9th Cir. 1992), the Ninth Circuit expressly stated that it had
25 not considered whether such a privilege exists. It went to hold that even if the privilege *did* exist, it
26 did not apply in that case. *Id*. Plaintiffs point to numerous decisions in which district courts in the
27 Ninth Circuit have found that the self-critical analysis privilege did not apply because the Ninth

28

4

1  Circuit has not approved its use. Joint Letter at 8 (citing *Schlelgel v. Kaiser Foundation Health*
2  *Plan*, 2008 U.S. Dist. LEXIS 111583 (E.D. Cal. Oct. 10, 2008); *Randolph v. E. Palo Alto*, 2007 U.S.
3  Dist. LEXIS 89249 (N.D. Cal. Nov. 20, 2007); *Granberry v. Jet Blue Airways*, 228 F.R.D. 647
4  (N.D. Cal. 2005); *Price v. San Diego*, 165 F.R.D. 614 (S.D. Cal. 1996)).

In any event, Plaintiffs argue, the test used in other circuits to determine whether the privilege applies has not been met here. In particular, Plaintiffs argue that there is no public interest in maintaining the confidentiality of the information that Defendant seeks to protect and further, the documents Plaintiffs seek do not contain the type of information whose flow would be curtailed if discovery were allowed because companies must make reasonable compliance efforts, regardless of any future litigation.

### C.  Defendant's Position

Wells Fargo counters that its assertion of attorney-client privilege, work product and the self-critical analysis privilege is proper. With respect to attorney-client privilege, Defendant notes that it is undisputed that documents listed on the privilege log that were to or from inside counsel are protected.[1] Further, Defendant asserts that although the face of the documents does not reflect this, the Position Description Questionnaires and Exemption Certification Forms listed on Defendant's privilege log[2] were completed by managers at the request of counsel and for counsel to provide legal advice. Therefore, Defendant asserts, these documents were properly withheld on the basis of attorney-client privilege as documents to or from counsel.

As to the documents that were neither authored by nor sent to counsel, Wells Fargo argues that these communications are protected under the attorney-client privilege because the audits were

---

[1] Wells Fargo has identified the following individuals listed on its privilege log as inside counsel: Kristin Arneson (aka Kristin Cutler), Timothy Grubb, Christine Meuers, David Otsuka, Gene Sheih, Jackie Sung, Lupe Valencia, Melissa Wright, and Molly Wright.

[2] The Position Description Questionnaires and Exemption Certification Forms listed on the privilege log are Document Nos. 1-534, 1076, 1086-1089, 1096, 1097, 1118, 1141-1143, 1147, 1148, 1152-1155, 1161-1163, 1165, 1167, 1169-1171, 1175, 1177-1182, 1185, 1188, 1190, 1191, 1193-1195.

5

initiated by counsel and either conducted or supervised by counsel. *See* Grubb Decl., ¶¶ 7-8. Specifically, Defendant's counsel, Timothy Grubb, states as follows:

> Counsel was involved in all aspects of the audits. For instance, Counsel initiated each of the FLSA and state law audits. Counsel also drafted communications relating to the audit, consulted with the Compensation Group on legal issues, reviewed information provided about the positions to provide legal advice about the FLSA and state law exemption classification, and provided legal advice about FLSA and state law classifications and the reclassification process (if the exemption classification was changed).

*Id.*, ¶ 7. Wells Fargo also asserts that it would have been clear to recipients of communications relating to the audits that they were covered by attorney-client privilege. Grubb states:

> Counsel provided and made the initial communication to the Compensation Group of individuals in positions to be reviewed. Several of the communications to the Compensation Group initiating review stated in all capital letters "CONFIDENTIAL ATTORNEY CLIENT COMMUNICATION." The communication further advised the recipients "As you are gathering this information at my request, all such information is the work product of the Wells Fargo Law Department. This project is being conducted by the Wells Fargo Law Department and as such is protected by attorney client confidentiality and all applicable privilege. Please remember that this information is confidential and should only be shared with those who have a need to know. Please be sure to send all correspondence, including e-mail correspondence, related to this project to me." Other communications contain similar language. By sending these communications initiating the FLSA and state law audit, Counsel directed members of the Compensation Group to serve as agents of counsel to perform tasks and participate in communications on Counsel's behalf. The scope and complexity of the internal FLSA and state law audits necessitated Counsel's reliance on others to engage in conduct and communications reflecting Counsel's thoughts and impressions to complete the audits.

*Id.*, ¶ 8.

Defendant asserts that neither *Flintkote* nor *IP Co. LLC v. Cellnet Technology Inc.*, cited by Plaintiffs, support Plaintiffs' position with respect to attorney-client privilege. In particular, Defendant argues that *Flintkote* does not articulate a broad rule limiting attorney-client privilege to communications to or from counsel. Rather, Defendant asserts, the court found that there was no attorney-client privilege as to communications between officers and employees of the company where the redacted portions appeared to "be opinions of claims handlers, rather than any advice from counsel." 2009 U.S. Dist. LEXIS 44066, at * 18. Similarly, Defendant argues that in *IP Co.*, the court acknowledged that communications that are not to or from counsel may be protected by

6

attorney-client privilege where the communications related to the purpose of seeking legal advice, as Defendant asserts is the case as to the documents listed on its privilege log.

Wells Fargo argues that the documents listed on the privilege log are also protected as work product. According to Wells Fargo, many of these documents were created in the course of conducting audits undertaken in response to *Gerlach v. Wells Fargo*, which was filed in February 2005 and involved allegations that Wells Fargo Business System Consultants and Business Systems Analysts were misclassified. *See* Grubb Decl., ¶ 4. Wells Fargo counsel, Timothy Grubb, states as follows:

> The 2005 and later audits were specifically undertaken in response to the *Gerlach* case, filed by Lieff Cabraser, and the increasing number of challenges to exemption status of positions in the technology area. We anticipated that Lieff Cabraser (or some other counsel) would allege misclassification of other positions within the Technology Group. Indeed, they did, when they filed the instant lawsuit, *Lewis v. Wells Fargo*, on March 28, 2008, alleging that everyone who installed, supported or maintained hardware of software was misclassified.

Grubb Decl., ¶ 5. In support of its assertion that the audit documents are work product, Wells Fargo cites to *Gatewood v. Koch Foods of Miss.*. 2008 WL 1450612 (S.D. Miss. April 9, 2008). According to Wells Fargo, in that case the court held that documents created as the result of an internal study were found to be work product.

Wells Fargo rejects Plaintiffs' argument that the documents listed on the privilege log do not fall within the work product doctrine because they relate to a business purpose. First, Wells Fargo asserts that as a factual matter, the only reason the audits were conducted was the misclassification litigation. According to Wells Fargo, *in camera* review of a sampling of documents will reveal that the documents were not part created as a result of a study of on-going management problems or routine compliance efforts – in contrast to *Marceau* and *Brantigan* – but rather, were created in anticipation of litigation. Second, even if the documents had an ancillary business purpose in addition to being prepared in anticipation of litigation, Wells Fargo argues, they are still entitled to protection because documents created for a dual purpose are still protected. Nor have Plaintiffs demonstrated that they have a substantial need for discovery of the documents, Wells Fargo

7

contends, as it has already been providing Plaintiffs, on a rolling basis, the contact information for each opt-in plaintiff.

Finally, Wells Fargo rejects Plaintiffs' assertion that there is no self-critical analysis privilege in the Ninth Circuit. In fact, Defendant asserts, the Ninth Circuit has expressly set forth the test for asserting the privilege. Joint Letter at 17 (quoting *Dowling v. American Hawaii Cruises, Inc.*, 971 F.2d 423 (9th Cir. 1992)). That test requires that the following elements must be met:

> [F]irst, the information must result from a critical self-analysis undertaken by the party seeking protection; second, the public must have a strong interest in preserving the free flow of the type of information sought; finally, the information must be of the type whose flow would be curtailed if discovery were allowed." Note, The Privilege of Self-Critical Analysis, 96 Harv.L.Rev. 1083, 1086 (1983). To these requirements should be added the general proviso that no document will be accorded a privilege unless it was prepared with the expectation that it would be kept confidential, and has in fact been kept confidential.

*Id*. Wells Fargo asserts that all of these requirements are met here.

### D. Documents Submitted for *In Camera* Review

Plaintiffs designated the following documents listed on Wells Fargo's privilege log for *in camera* review: document numbers 97, 810, 811, 817, 1887 and 1373. In a letter to the Court dated February 4, 2010, Wells Fargo notes that it has replaced document number 1373 with document number 1952 because Wells Fargo determined, after Plaintiffs selected document number 1373 for *in camera* review, that that document had been included on the privilege log inadvertently. Wells Fargo explained that it had withheld the document because the facsimile cover sheet attached to it referenced communications with in-house counsel but that the document itself was not privileged. When Wells Fargo discovered the error, it produced document number 1373 to Plaintiffs. According to Wells Fargo, it has told Plaintiffs that "it will re-review the documents listed on the privilege log to ensure that no others were inadvertently withheld from production." In addition to the six documents selected by Plaintiffs for in camera review, Defendants have offered the following six documents for *in camera* review: document numbers 1090, 1142, 1934, 1778, 756, and 788.

### III. ANALYSIS

As a preliminary matter, the Court rejects Defendants reliance on the self-critical analysis privilege. First, this Court agrees with the many other courts that have concluded that in the Ninth

8

1  Circuit, at least, such a privilege does not exist. *See, e.g., Granberry v. Jet Blue Airways*, 228
2  F.R.D. 647, 650 (N.D. Cal. 2005) ("As a matter of federal law – more specifically, as a matter of
3  Ninth Circuit law – it is unlikely that the self-critical analysis privilege exists").  Second, the Court
4  is not persuaded that allowing discovery of FLSA audit results would curtail such audits.  As this is
5  one of the elements that is required in order for the self-critical analysis privilege to apply, Wells
6  Fargo has not demonstrated that the the documents listed on the privilege log fall within this
7  privilege, even assuming it exists. Therefore, the Court addresses whether the documents listed on
8  Defendant's privilege log may be withheld on the basis that they are work product or
9  communications that fall within the scope of the attorney-client privilege.

### A. Work Product Doctrine

The work product doctrine is codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure, which protects from discovery "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." *See In re Grand Jury Subpoena*, 357 F.3d 900, 906 (9th Cir. 2004).  The work product privilege is intended to prevent exploitation of a party's efforts in preparing for litigation. *Admiral Ins. Co. v. District Court*, 881 F.2d 1486, 1494 (9th Cir. 1989).  The doctrine is "an intensely practical one," and thus recognizes that "attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial." *In re Grand Jury Subpoena*, 357 F.3d at 906  (quoting *United States v. Noble*, 422 U.S. 225, 238 (1975)).  Thus, the doctrine may be applied to documents created by non-attorneys so long as they are prepared "by or for another party or its representative" and they are created "in anticipation of litigation."

The Ninth Circuit has adopted the "because of" standard for determining whether a document was prepared "in anticipation of litigation." *Id.* at 907.  That standard is described as follows in *In re Grand Jury Subpoena*:

> [W]e join a growing number of our sister circuits in employing the formulation of the "because of" standard articulated in the Wright & Miller Federal Practice treatise. This formulation states that a document should be deemed prepared "in anticipation of litigation" and thus eligible for work product protection under Rule 26(b)(3) if "in light of the nature of the document and the factual situation in the particular case, the document can be fairly said

> to have been prepared or obtained because of the prospect of litigation." Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, 8 Federal Practice & Procedure § 2024 (2d ed. 1994) ("Wright & Miller"). . . . The "because of" standard does not consider whether litigation was a primary or secondary motive behind the creation of a document. Rather, it considers the totality of the circumstances and affords protection when it can fairly be said that the "document was created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of that litigation[.]" Adlman, 134 F.3d at 1195.

*Id*. at 907-908. Further, "except where a document would have been generated in the normal course of business even if no litigation was anticipated, the work product doctrine can reach documents prepared because of litigation even if they were prepared in connection with a business transaction or also served a business purpose." *Id*.

Here, the Court concludes that the documents arising out of the FLSA audits listed on Defendant's privilege log were not created in anticipation of litigation but rather, would have been created in substantially similar form even if no litigation was anticipated. This is apparent from the fact that the audits began at least year before the *Gerlach* case was filed, in February 2005. *See Marceau*, 246 F.R.D. 610, 614 (D. Ariz. 2007) ("the fact that litigation was not imminent tends to support the argument that the Report was not prepared in anticipation of litigation. . . . The audit was conducted between April 28, 2004 and November 20, 2004, and this matter was filed September 19, 2005"); *Brantigan v. Depuy Spine, Inc.*, 2008 U.S. Dist. LEXIS 78052 (W.D. Wash. Sept. 12, 2008) (holding that audit was conducted for routine business purpose and not in anticipation of litigation based, in part, on the fact that the audit was conducted over a year before the complaint was filed). Wells Fargo does not identify any specific litigation that occurred prior to *Gerlach* and does not provide any evidence that the two audits that were commenced in 2004 were in anticipation of litigation. Indeed, it implicitly concedes that the 2004 audits *were not* in anticipation of litigation to the extent that its counsel states that "[t]he 2005 and later audits were specifically undertaken in response to the *Gerlach* case." Grubb Decl., ¶ 5.

Rather, it is evident that the audits were conducted to insure compliance with law. First, Wells Fargo admits that, as a result of the audits, reclassifications were made. Second, the documents themselves suggest that the audits were not conducted in anticipation of litigation. For

10

example, document number 810 includes in proposed talking points the statement that "Periodically, HR, Corporate Comp and the Law Department will review positions to ensure that the jobs are properly classified." The fact that there was ongoing litigation regarding classification does not change this result. A generalized fear of litigation does not turn a compliance audit into attorney work product. *See In re Grand Jury Subpoena*, 357 F.3d at 909. Moreover, Wells Fargo has not shown that any of the audits were tied to the specific categories of jobs challenged in the litigation it cited as the reason for the audits. Rather, the possibility of further litigation aimed at other job classifications compelled Wells Fargo to make sure that its classifications complied with the law. Therefore, the Court concludes that none of the audit documents were created "because of" anticipated litigation and the work product doctrine does not protect the documents listed on Wells Fargo's privilege log from disclosure.

### B.      Attorney-Client Privilege

#### 1.      Legal Standard

The attorney-client privilege is one of the oldest of the common law privileges. *Upjohn v.U.S.*, 449 U.S. 383, 389 (1981). Its purpose is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id.* The Ninth Circuit has set forth the following essential elements of attorney client privilege:

(1) Where legal advice of any kind is sought

(2) from a professional legal adviser in his capacity as such,

(3) the communications relating to that purpose,

(4) made in confidence

(5) by the client,

(6) are at this instance permanently protected

(7) from disclosure by himself or by the legal adviser,

(8) unless the protection be waived.

11

*Admiral Ins. Co. v. District Court*, 881 F.2d at 1492 (quoting *In re Fischel*, 557 F.2d 209 (9th Cir. 1977)). The application of this test in the corporate context, however, raises "special problems," because "[a]s fictitious entities, corporations can seek and receive legal advice and communicate with counsel only through individuals empowered to act on behalf of the corporation." *Id*.

In *Upjohn*, the Supreme Court addressed these special problems, and in particular, the "control group" approach that some courts had taken to determine the limits of attorney-client privilege in a corporate setting. 449 U.S. at 390. The "control group" test asked whether the employee whose communication was at issue was "in a position to control or even to take a substantial part in a decision about any action which the corporation may take upon the advice of the attorney." *Id*. The Supreme Court rejected this approach, explaining that it "overlook[ed] the fact that the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Id*. Expanding on this point, the Court stated as follows:

> In the case of the individual client the provider of information and the person who acts on the lawyer's advice are one and the same. In the corporate context, however, it will frequently be employees beyond the control group as defined by the court below-"officers and agents ... responsible for directing [the company's] actions in response to legal advice"-who will possess the information needed by the corporation's lawyers. Middle-level-and indeed lower-level-employees can, by actions within the scope of their employment, embroil the corporation in serious legal difficulties, and it is only natural that these employees would have the relevant information needed by corporate counsel if he is adequately to advise the client with respect to such actual or potential difficulties.

*Id*. at 391. Thus, the *Upjohn* Court held that in that case, interview notes and questionnaires that were completed by employees as part of an investigation initiated by counsel were subject to attorney-client privilege because the questions were within the scope of the employees' duties and the employees were "sufficiently aware that they were being questioned in order that the corporation could obtain legal advice." *Id*. at 394. In addition, the Court noted that "[m]anagers were instructed to treat the investigation as 'highly confidential' and not to discuss it with anyone other than Upjohn employees who might be helpful in providing the requested information." *Id.* at 387.

In concluding that employees were aware that they were being questioned in order for the corporation to obtain legal advice, the Court pointed to the following evidence:

12

> The questionnaire identified Thomas as "the company's General Counsel" and referred in its opening sentence to the possible illegality of payments such as the ones on which information was sought. App. 40a. A statement of policy accompanying the questionnaire clearly indicated the legal implications of the investigation. The policy statement was issued "in order that there be no uncertainty in the future as to the policy with respect to the practices which are the subject of this investigation." It began "Upjohn will comply with all laws and regulations," and stated that commissions or payments "will not be used as a subterfuge for bribes or illegal payments" and that all payments must be "proper and legal." Any future agreements with foreign distributors or agents were to be approved "by a company attorney" and any questions concerning the policy were to be referred "to the company's General Counsel." Id., at 165a-166a. This statement was issued to Upjohn employees worldwide, so that even those interviewees not receiving a questionnaire were aware of the legal implications of the interviews.

*Id*. at 394-395.

In *Admiral Ins.*, the Ninth Circuit cited to *Upjohn* for the proposition that in the corporate context, attorney-client privilege "applies to communications by any corporate employee regardless of position when the communications concern matters within the scope of the employee's corporate duties and the employee is aware that the information is being furnished to enable the attorney to provide legal advice to the corporation." *Admiral Ins. Co. v. District Court*, 881 F.2d at 1492 (citing *Upjohn*, 449 U.S. at 394). The court noted, however, that *Upjohn* "declined to establish an all-encompassing test for application of the attorney-client privilege to corporations." *Id*. at 1492. Rather, *Upjohn* held that each case must be evaluated on its own facts to determine whether application of attorney-client privilege would further the underlying purpose of the privilege, that is, to encourage candid communications between client and counsel. *Id*.

The approach articulated in *Upjohn* was applied in the context of an FLSA audit in *Deel v. Bank of America*, 227 F.R.D. 456 (W.D.Va. 2005). In that case, the court addressed whether questionnaires completed by the corporation's employees as part of an internal FLSA investigation were subject to attorney-client privilege. The court concluded they were not because, in contrast to the facts in *Upjohn*, the employees who completed the questionnaires were not sufficiently aware that they were doing so to assist the corporation in obtaining advice from counsel. *Id*. at 461. The court in *Deel* distinguished the facts of that case from those in *Upjohn* as follows:

> Here, BOA found itself in a similar position as Upjohn, but it did not respond in the same manner. Like Upjohn, BOA realized that it may have been in violation of federal law. It also realized that upper-echelon management did not possess the information it needed to obtain

13

1  legal advice. It concluded, therefore, that it needed to question those employees who had the information it needed to obtain a legal opinion. It then sent a questionnaire to those employees who, as a function of their duties, possessed that information.

The defendant's fatal flaw, however, was that it did not clarify to the employees completing the questionnaire that it needed the information to obtain legal advice. In *Upjohn*, the company's Chairman explained in a letter accompanying the questionnaire that he asked the company's general counsel to conduct an investigation to determine the nature and magnitude of possible illegal activities. Id., at 386-87, 101 S.Ct. 677. Here, the only possible way a BOA employee may have thought the information had a legal purpose was that the notice document referenced questions to "Advice & Counsel" department. The two references to the Advice & Counsel as the source for employee questions is not the same-or even similar-level of precaution *Upjohn* took in distributing its questionnaires.

The defendant also failed to explain in the notice section entitled "Background; Why Do We Need To Review Jobs?" that the purpose of the questionnaire was to help the Bank obtain legal advice. It stated:

> Bank of America routinely reviews job titles, responsibilities and pay structure to ensure the most competitive compensation and appropriate banding and exemption status are in place in order to attract, reward and retain the best associates. A review process such as this sometimes results in positions being reclassified with respect to overtime eligibility.
>
> The company depends on you to ensure that we understand the duties performed by your associates and that the associates are appropriately assigned to the jobs. *462 Our goal is to ensure we remain in compliance with the law outlined in the Fair Labor Standards Act as to how we pay our associates.

BOA1004. This section suggests the questionnaire was part of a routine review, not as an effort to obtain legal advice. Further, it says that it will use the information to remain competitive and reward its employees. These statements fail to indicate that the bank needed the information to obtain a legal opinion.

Although the Bank mentions relevant law, it does not overcome its burden to notify its employees that it needs their help in obtaining legal advice by this act alone. Simply reciting an act of Congress-especially when surrounded by language indicating non-legal purposes-does not create a clear statement of policy accompanying the questionnaire indicating the legal implications of the investigation. Indeed, using the word "remain" suggests it is in compliance with the law, and has no need for legal advice.

Additionally, it tells its employees that business leaders (not its general counsel or outside lawyers) would review the information gleaned from the questionnaires. *Id.* Such a statement suggests the information would facilitate the Bank in making a business decision not obtaining legal advice. . . . These references simply could not have put BOA employees on notice that the questionnaires would facilitate the company in obtaining legal advice.

Finally, Upjohn made certain that its employees knew the investigation was "highly confidential" and discouraged discussion of the matter with non-Upjohn employees. . . Here, BOA's notice remains silent on the level of discretion it expected of its employees. Without more, the Court must conclude the Bank did not maintain the level of confidentiality the Supreme Court approved in *Upjohn*.

14

*Id.* at 461-462.

### 2. **Documents Produced for *In Camera* Review**

The Court now turns to the twelve documents provided for *in camera* review. Based on this sampling, the documents listed on Defendant's privilege log appear to fall into the following general categories: 1) memoranda circulated within Wells Fargo's Law Department regarding the audit (Doc. No. 756); 2) communications about the audits to and from attorneys in Well's Fargo's Law Department to individuals who worked in Wells Fargo's Compensation Group and in Human Resources (Doc. Nos. 1090, 788, 810, 1952); 3) communications about the audits among individuals who worked in the Compensation Group and Human Resources (Doc. Nos. 1934, 1778) ; 4) documents created by Compensation Group employees summarizing the results of the investigation for use by the Law Department (Doc. Nos. 817, 1887); 5) Questionnaires and checklists completed by managers who were not Compensation Group or Human Resources employees providing information relating to the classification of team members under their supervision (Doc. Nos. 97, 1142).[3]

#### a. **Communications between, to or from in-house counsel**

Several of the documents listed on the privilege log are communications to or from Wells Fargo's in-house counsel related to the audits, or memoranda that were circulated among attorneys in the Law Department. For example, Document Numbers 1090 and 788 are memoranda from Well's Fargo's in-house counsel to individuals in the Compensation Group and Human Resources formally requesting information relating to the job duties of employees holding specific positions. These documents are clearly marked as privileged and further explain that all information collected is subject to privilege. Similarly, document 1952 is a memorandum from in-house counsel to

---

[3]Document Number 811, designated for review by Plaintiffs, does not fall into any of these categories. Rather, it is a print-out from the Wells Fargo Market Pricing tool that is used by the Compensation Group when determining salary ranges for new or existing job categories. Defendants were unable to identify the source of this document and could only say that it was in the hard copy files maintained in connection with the audits. There is nothing in the document suggesting, on its face, that it contains any privileged attorney-client communication. Therefore, the Court finds no basis for claiming attorney-client privilege as to this document.

15

individuals in Human Resources that is clearly marked as privileged. This document contains legal advice of in-house counsel regarding the classification of employees holding a specific position. Document 756 is a memorandum by Wells Fargo attorney Timothy Grubb that was circulated to other members of the Law Department concerning some of the audits and includes recommendations. The document is clearly identified as privileged. Finally, Document 810 is a draft communication intended to be given to managers to explain job reclassifications to employees, which was sent by a compensation consultant to attorneys in the Wells Fargo Law Department for comment. The document is designated as "confidential."

Plaintiffs do not dispute that documents such us these, which are addressed to or from counsel, fall within the attorney-client privilege. The Court agrees.

### b. Communications about the audits among individuals who worked in the Compensation Group and Human Resources

A second category of documents are communications among members of the Compensation Group or Human Resources relating to the audits. The documents provided for in camera review that fall into this category, numbers 1934 and 1788, expressly reference communications with counsel about the audits, and therefore clearly fall under the attorney-client privilege. The Court notes, however, that if any of the non-attorney communications between employees of the Compensation Group and the Human Resources Department that are listed on Defendants' privilege log *do not* expressly reference communications with counsel, Defendants will need to take care not to withhold those documents improperly on the basis of attorney-client privilege. Under *Upjohn*, the relevant inquiry as to those communications is whether: 1) the communication was within the scope of the employee's corporate duties; and 2) the employee was aware that the communication was made in order to enable Wells Fargo's attorneys to provide legal advice to the corporation and understood that the audit to which the communication related was to be treated as confidential.

There seems to be little question that the audits were within the scope of the corporate duties of the Compensation Group or Human Resources employees and therefore, non-attorney communications between these individuals relating to the audits were within the scope of their

16

corporate duties.  Defendants must also ensure, however, that with respect to each specific non-attorney communication for which privilege is claimed, the individual who originated the communication had notice, in the form of a memorandum like Document Nos. 1090 and 788, or on the basis of some other communication from counsel, that the specific audit to which the communication related was initiated by counsel and was subject to attorney-client privilege. The Court is concerned that Mr. Grubb's declaration is not entirely explicit as to whether documents such as Numbers 1090 and 788, formally initiating the audits and explaining that information collected would be privileged, were sent out for each of the audits listed above.  Nor has Wells Fargo provided evidence that each of the non-attorney communications by Compensation Group and Human Resources employees for which it claims attorney-client privilege were created by an individual who received either a memorandum from the Law Department such as the ones described above or some other document that would have led the individual to understand that the audit was being conducted on behalf of counsel in order to obtain legal advice.

In re-reviewing the documents listed on its privilege log, then, Wells Fargo may withhold documents by non-attorneys in the Compensation Group and Human Resources relating to the audits only as to individuals who are listed as recipients of either a memorandum such as the ones provided for *in camera* review, initiating the particular audit to which the communication relates, or some similar communication that would have put the individual on notice that the audit was being conducted at the request of counsel and that information obtained as a result of the audit was subject to attorney-client privilege.

### c. Documents Created by Compensation Group employees summarizing the results of the investigation for use by the Law Department

The documents listed on Wells Fargo's privilege log also include documents created by members of the Compensation group relating to or summarizing the factual findings of the investigation.  For example, Document Number 817 is a summary that was created by a Compensation Consultant at the request of counsel and was later used by counsel in a memorandum.

17

1  Document number 1887 is a list of individuals who held a specific position, apparently created for
2  use of the Law Department in connection with an audit.  Like the communications among
3  Compensation Group and Human Resources employees discussed above, these summaries fall
4  within the scope of the attorney-client privilege so long as it can be demonstrated that the specific
5  author of the communication was aware that the audit to which the communication related was being
6  conducted for the purposes of obtaining legal advice and that the document was being created to
7  advance that purpose.

### d. Questionnaires and Checklists

A large category of documents is made up of questionnaires and checklists completed by managers about the job duties of individual employees under there supervision, such as the Exemption Certification Checklist provided for *in camera* review, Document Number 97.  As discussed above, this type of document may be protected by attorney-client privilege if the requirements set forth in *Upjohn* are satisfied.  Here, however, they are not.  Strikingly absent from the Grubb Declaration is any statement that the managers who completed these questionnaires and checklists received anything akin to the documents received by the Compensation Group explaining that the information requested of the managers was being requested in order to obtain legal advice from counsel regarding FLSA compliance.  Nor do the documents themselves reflect as much.

For example, Document 1142 is a Position Description Questionnaire that was completed by a manager and returned to a compensation consultant.  There is no evidence that the manager who completed the form was told that the information was being collected on behalf of counsel.  Rather, the only instructions on the form stated that "[t]his form is to be completed by the manager, in consultation with the HRC."  As a result, the documents are not covered by attorney-client privilege because here, as in *Deel*, Wells Fargo did not take the sort of precautions that led the Court to conclude in *Upjohn* that the non-attorney communications were subject to attorney-client privilege.  Therefore, these documents are not covered by attorney-client privilege and must be produced, notwithstanding the fact that they were ultimately passed on to Wells Fargo's in-house counsel.

**IV.   CONCLUSION**

The documents listed on Wells Fargo's privilege log may not be withheld under the work product doctrine or the self-critical analysis privilege. Some, but not all, of the documents may be withheld on the basis of attorney-client privilege. The parties are instructed to meet and confer to develop specific guidelines, in light of this opinion, to be applied by Wells Fargo in determining which of the documents listed on its privilege log must be produced.

IT IS SO ORDERED.

Dated: March 11, 2010

JOSEPH C. SPERO
United States Magistrate Judge