1  JOAN B. TUCKER FIFE (SBN: 144572)
   Email: jfife@winston.com
2  WINSTON & STRAWN LLP
   101 California Street
3  San Francisco, CA 94111-5894
   Telephone:    415-591-1000
4  Facsimile:    415-591-1400

5  EVAN R. MOSES (SBN: 198099)
   Email: evmoses@winston.com
6  AUDREY SHEN CHUI (SBN: 254510)
   Email: achui@winston.com
7  WINSTON & STRAWN LLP
   333 S. Grand Avenue, Suite 3800
8  Los Angeles, CA 90071-1543
   Telephone: (213) 615-1700
9  Facsimile: (213) 615-1750

10 Attorneys for Defendant
   WELLS FARGO BANK, N.A.
11 (erroneously sued as Wells Fargo & Co.)

12

13                     UNITED STATES DISTRICT COURT

14                    NORTHERN DISTRICT OF CALIFORNIA

15                            OAKLAND DIVISION

16

17 MARTIN LEWIS, AARON COOPER, and       Case No.: CV-08-2670-CW (JCS)
   ANISSA SCHILLING, on behalf of
18 themselves and a class of those similarly   **DEFENDANT WELLS FARGO BANK N.A.'S**
   situated,                                   **OPPOSITION TO PLAINTIFFS' MOTION**
19                          Plaintiffs         **FOR CLASS CERTIFICATION**

                                              Date:        April 22, 2010
20        vs.
                                              Time:        2:00 p.m.
21 WELLS FARGO & CO.,
                                              Courtroom:   2 (4th floor)
22                          Defendant.
                                              Judge:       Honorable Claudia Wilken
23

24

25

26

27

28

# TABLE OF CONTENTS

Page(s)

I.   INTRODUCTION ................................................................................1

II.  FACTS AND PROCEDURAL HISTORY ....................................................2

   A.  Procedural History ...................................................................2

   B.  The Classes Plaintiffs Are Attempting To Certify.................................2

   C.  WF's Exemption Determinations Are Based On Individualized Assessments .......3

   D.  Substantial Variation In Job Duties Is Reflected In Customized Job
       Descriptions. .......................................................................4

   E.  Job Duties Varied Significantly Between Employees In Different Job Titles........4

   F.  Job Duties Varied Significantly Between Employees Within The Same Job
       Title.................................................................................5

   G.  The Three Named Plaintiffs Were All NE 4s, Yet They Performed Different
       Job Duties...........................................................................6

   H.  The Mix Of Job Duties For Many Putative Class Members Varied
       Significantly From Week To Week and Over Time.................................6

   I.  The Named Plaintiffs' Claims Differ From The Claims Of Reclassified
       Employees...........................................................................7

III. EXEMPTION CRITERIA AT ISSUE.......................................................8

IV.  ARGUMENT ................................................................................8

   A.  Plaintiffs Bear the Burden of Proving that a Class Can Be Certified .....................9

   B.  The Proposed Statewide Classes Cannot be Certified Under Rule 23(b)(3)
       Because Individual Issues Predominate and a Class Action is Not Superior .........9

       1.  In Determining Predominance, the Court Must Focus On Whether
           Exempt Status Can Be Adjudicated On A Classwide Basis .......................9

       2.  The Substantial Variations in Job Duties Both Between And Within
           Job Titles Require Denial of Class Certification .......................................10

       3.  Plaintiffs' Alleged "Common Proofs" Would Not Allow For Joint
           Adjudication Of Exempt Status .................................................................11

           a.  The alleged common proofs are not in fact common to the
               proposed classes..........................................................................12

           b.  The alleged common proofs do not render the job duties of the
               putative class members uniform ...................................................15

           c.  Plaintiffs have not shown that the alleged common proofs
               prevent the putative class members from exercising discretion
               and independent judgment ............................................................15

i

(i)      The use of operating manuals does not prevent the exercise of discretion and independent judgment.............16

(ii)     Change control procedures do not prevent the exercise of discretion and independent judgment...........................17

(iii)    Ticketing and work assignment systems are not relevant to exempt status................................................................18

(iv)     Service Level Agreements are not relevant to exempt status ....................................................................................18

(v)      Monitoring of assignment completion has no relevance to exempt status................................................................19

(vi)     Common timekeeping systems have no relevance to exempt status................................................................19

(vii)    WF's treatment of employees as exempt or nonexempt by job title shows that joint adjudication of all 26 jobs is impossible........................................................................19

4.      A Class Adjudication Would Not Be Superior Because Hundreds, If Not Thousands, of Individualized Inquiries Are Required.......................20

C.    The Proposed Statewide Classes Cannot Be Certified Under Rule 23(a) Because The Requirements of Commonality and Typicality Are Not Satisfied ...20

D.    Plaintiffs' ERISA Claims Cannot Be Certified Under Rule 23(b)(1)(B). .............22

E.    Plaintiffs Did Not Allege Any Facts Supporting ERISA Rule 23(b)(3) Certification. ...................................................................................23

F.    None Of Plaintiffs' Proposed Classes Can Be Certified Under Rule 23(b)(2)......23

G.    Plaintiffs Are Not Entitled To Equitable Tolling...................................................24

V.    CONCLUSION..........................................................................................................25

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION - CASE NO. 08-2670 CW**

1

# TABLE OF AUTHORITIES

**Page(s)**

2

CASES

3

*Aguilar v. Melkonian Enters., Inc.,*
    2007 WL 201180 (E.D. Cal. Jan. 24, 2007) ...............................................23

4

5

*Alba v. Papa John's USA, Inc.,*
    2007 WL 953849 (C.D. Cal. Feb. 7, 2007)..........................................13, 15

6

7

*Bagwell v. Florida Broadband, LLC,*
    385 F. Supp. 2d (S.D. Fla. 2005) ...........................................................18

8

*Batsakis v. Fed. Deposit Ins. Corp.,*
    670 F. Supp. 749 (W.D. Mich 1987) .......................................................24

9

10

*Becher v. Long Island Lighting Co.,*
    164 F.R.D. 144 (E.D.N.Y. 1996) ............................................................23

11

*Besinga v. United States,*
    923 F.2d 133 (9th Cir. 1991) ...................................................................24

12

13

*Brown v. FedEx Corp.,*
    249 F.R.D. 580 (C.D. Cal. 2008) ..............................................................3

14

15

*Burke v. County of Monroe,*
    225 F. Supp. 2d 306 (W.D.N.Y. 2002) ....................................................18

16

*Cline v. The Industrial Maint. Eng'g & Contracting Co.,*
    200 F.3d 1223 (9th Cir. 2000) .................................................................24

17

18

*Damassia v. Duane Reade, Inc.,*
    250 F.R.D. 152 (S.D.N.Y. 2008) ......................................................13, 15

19

20

*Diaz v. United Agr. Employee Welfare Ben. Plan & Trust,*
    50 F.3d 1478 (9th Cir. 1995) ...................................................................24

21

*Diduck v. Kaszycki & Sons Contractors, Inc.,*
    737 F. Supp. 792 (S.D.N.Y. 1990)...........................................................23

22

23

*Dunbar v. Albertson's, Inc.,*
    141 Cal.App.4th 1422 (2006) ..................................................................11

24

25

*Edwards v. City of Long Beach,*
    467 F. Supp. 2d 986 (C.D. Cal. 2006) .....................................................21

26

*Gabriella v. Wells Fargo Financial, Inc.,*
    2008 WL 3200190 (N.D. Cal. 2008) ..........................................................3

27

28

*Great-West Life & Annuity Ins. Co. v. Knudson,*
    534 U.S. 204 (2002).................................................................................24

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION - CASE NO. 08-2670 CW

*Green v. Occidental Petroleum, Corp.,*
    541 F.2d 1335 (9th Cir. 1976) ..................................................................................23

*Gruby v. Brady,*
    838 F. Supp. 820 (S.D.N.Y. 1993)..............................................................................23

*Hanon v. Dataproducts Corp.,*
    976 F.2d 497 (9th Cir. 1992) ......................................................................................21

*Haywood v. North Am. Van Lines Inc.,*
    121 F.3d 1066 (7th Cir. 1997)....................................................................................17

*Heffelfinger v. Electronic Data Sys. Corp.,*
    580 F. Supp. 2d 933 (C.D. Cal. 2008) ........................................................................17

*Hill v. R+L Carriers, Inc.,*
    2010 WL 334853 (N.D. Cal. Jan. 22, 2010) ...........................................................8, 11

*In re Computer Memories,*
    111 F.R.D. 675 (N.D. Cal. 1986)................................................................................21

*In re Computer Sci. Corp. ERISA Litigation,*
    2008 U.S. Dist. LEXIS 109027 (C.D. Cal. Sept. 2, 2008).........................................23

*In re First Am. Corp. ERISA Litig.,*
    258 F.R.D. 610 (C.D. Cal. 2009) ................................................................................23

*In re Syncor ERISA Litig.,*
    227 F.R.D. 338 (C.D. Cal. 2005) ................................................................................23

*In re Wells Fargo,*
    2010 WL 174329 (N.D. Cal. Jan. 13, 2010) .........................................8, 9, 10, 20

*In re Wells Fargo,*
    527 F. Supp. 2d 1053 (N.D. Cal. 2007) ......................................................................25

*In re Wells Fargo Home Mortgage Overtime Pay Litigation,*
    571 F.3d 953 (9th Cir. 2009) ........................................................................... passim

*Jimenez v. Domino's Pizza,*
    238 F.R.D. 241 (C.D. Cal. 2006) .....................................................................10, 21, 24

*Keller v. Tuesday Morning,*
    179 Cal.App.4th 1389 (2009) .....................................................................................10

*Khadera v. ABM Industries, Inc.,*
    2010 WL 605308 (W.D. Wash. Feb. 19, 2010).........................................................21

*LaRue v. DeWolff, Boberg & Assoc., Inc.,*
    552 U.S. 248 (2008).............................................................................................23, 24

iv

*Leavitt v. Northwestern Bell Telephone Co.*,
   921 F.2d 160 (8th Cir. 1990) ........................................................25

*Leuthold v. Destination America, Inc.*,
   224 F.R.D. 462 (N.D. Cal. 2004) ..................................................21

*Lutz v. Ameritech Corp.*,
   2000 U.S. App. LEXIS 3218 (6th Cir. 2002) ...............................1, 17

*Maddock v. KB Homes, Inc.*,
   248 F.R.D. 229 (C.D. Cal. 2007) ..................................................25

*Massaro v. New York Times, Inc.*,
   1988 WL 59637 (S.D.N.Y. 1988) ..................................................18

*Mathews v. Chevron Corp.*,
   362 F.3d 1172 (9th Cir. 2004) ......................................................25

*McAllister v. Transamerica Occidental Life Ins. Co.*,
   325 F.3d 997 (8th Cir. 2003) ........................................................17

*McDonnell-Douglas Corp. v. U.S. Dist. Court for the Centr. Dist. of Cal.*,
   523 F.2d 1083 (9th Cir. 1975) ......................................................23

*Medepalli v. Maximus, Inc.*,
   2008 U.S. Dist. LEXIS 28509 (E.D. Cal. Apr. 8, 2008)...............1, 17, 18, 19

*Mendoza v. Home Depot U.S.A., Inc.*,
   2010 WL 424679 (C.D. Cal. Jan. 21, 2010) .............................15, 24

*Mogel v. UNUM*,
   646 F. Supp. 2d 177 (D. Mass. 2009) ..........................................24

*Molski v. Gleich*,
   318 F.3d 937 (9th Cir. 2003) ........................................................24

*Murray v. Stuckey's Inc.*,
   50 F.3d 564 (8th Cir. 1995) ..........................................................17

*Naton v. Bank of California*,
   649 F.2d 691 (9th Cir. 1981) ........................................................25

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999)......................................................................23

*Peralta v. Hispanic Bus. Inc.*
   419 F.3d 1064 (9th Cir. 2005) ......................................................25

*Perez v. Uline, Inc.*,
   157 Cal.App.4th 953 (2007) .........................................................25

*Perry v. U.S. Bank*,
   2001 WL 34920473 (N.D. Cal. Oct. 16, 2001)........................................................10

*Pfohl v. Farmers Ins. Group*,
   2004 WL 554834 (C.D. Cal. Mar. 1, 2004)............................................................10

*S.M. v. Board of Educ. Of Albuquerque*,
   455 F.Supp.2d 1286 (D.N.M. 2006) .....................................................................22

*Sanchez v. Wal Mart Stores, Inc.*,
   2009 WL 1514435 (E.D. Cal. May 28, 2009) .......................................................22

*Sepulveda v. Wal-Mart Stores, Inc.*,
   237 F.R.D. 229 (C.D. Cal. 2006) ..........................................................................10

*Simpson v. Fireman's Fund Ins. Co.*,
   231 F.R.D. 391 (N.D. Cal. 2005)...........................................................................23

*Somora v. Marriott Corp.*,
   812 F. Supp. 917 (D. Minn. 1993) .........................................................................25

*Specialty Cabinets & Fixtures, Inc. v. Am. Equitable Life Ins. Co.*,
   140 F.R.D. 474 (S.D. Ga. 1991) ............................................................................23

*Stewart v. Avon Products*,
    1999 WL 1038338 (E.D. Pa. 1999)......................................................................22

*Tierno v. Rite Aid Corp.*,
   2006 WL 2535056 (N.D. Cal. Aug. 31, 2006) ...............................................13, 15

*Valentino v. Carter-Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996) .................................................................................10

*Varity Corp. v. Howe*,
   516 U.S. 489 (1996).................................................................................................25

*Vinole v. Countrywide Home Loan, Inc.*,
   571 F.3d 935 (9th Cir. 2009) ......................................................................... passim

*Walsh v. Ikon Office Solutions, Inc.*,
   148 Cal.App.4th 1440 (2007) ................................................................................10

*Young v. Cerner Corp.*,
   2007 U.S. Dist. LEXIS 63566 (W.D. Mo. 2007).............................................1, 18

*Zinser v. Accufix Research Institute, Inc.*,
   253 F.3d 1180 (9th Cir. 2001) ...........................................................................9, 22

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION - CASE NO. 08-2670 CW**

**STATUTES**

Cal. Lab. Code § 515.5 ................................................................................................1, 8

**OTHER AUTHORITIES**

29 C.F.R. § 541.207(c)(5) (2001) ..................................................................................17

IWC Wage Order No. 4-2001 § 1(A)(1)..........................................................................8

IWC Wage Order No. 4-2001 § 1(A)(2)..........................................................................8

Minn. R. 5200.0180 ........................................................................................................8

Minn. R. 5200.0190 ........................................................................................................8

Minn. R. 5200.0200 ........................................................................................................8

DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION - CASE NO. 08-2670 CW

## I.    INTRODUCTION

No court h*as* ever certified an overtime exemption class as broad and diverse as the classes proposed by Plaintiffs.  Each of the proposed classes would encompass 26 different jobs from 11 different job families, and the record clearly shows that the job duties performed by the putative class members varied significantly from job to job and from employee to employee.  Plaintiffs make **no attempt at all** to show the job duties of the putative class members are actually similar, instead merely noting that they are all "technical support workers who install, maintain, and support Wells Fargo's hardware and software systems."[1]  That description has no legal relevance, as technical support workers perform a wide variety of job duties that can be exempt or nonexempt.[2]  The substantial variation in job duties is fatal to Plaintiffs' attempt to certify the proposed overtime exemption classes, as two recent Ninth Circuit decisions denying certification in overtime cases make clear.[3]  It is also fatal to Plaintiffs' attempt to certify their ERISA claims, which are entirely dependent on and derivative of their overtime exemption claims.

Plaintiffs attempt to stitch the proposed classes together with an obscuring fog of alleged "common proofs," including operating manuals, change controls, and service level agreements. Plaintiffs bear the burden of proof, however, and they have not shown (and cannot show) that any of the alleged common policies (1) were in fact common to the entire class, (2) rendered the job duties of the putative class members uniform, or (3) impacted putative class members in a way that uniformly prevented them from performing exempt work.  Wells Fargo ("WF"), by contrast, has presented voluminous evidence showing that many members of the putative class regularly exercise independent discretion and judgment as part of their job duties and perform exempt work. Determining the exempt status of the putative class members will necessarily require individualized fact-specific inquiries, and Plaintiffs have not shown any viable means for the court to jointly determine their exempt status.  Class certification must be denied.

---

[1] Pl. Br. at 8.  Not all putative class members "install, maintain, and support" WF's systems.  Larson Dec. (MN) ¶ 4; Munson Dec. (MN) ¶ 16; Gress Dec. (MN) ¶ 13; J.H. Dec. ¶ 7; J.W. Dec. (MN) ¶10.
[2] *See, e.g.,* Cal. Lab. Code § 515.5 (computer programmer exemption); *Medepalli v. Maximus, Inc.*, 2008 U.S. Dist. LEXIS 28509 (E.D. Cal. Apr. 8, 2008) (senior developer who developed computer code was exempt); *Young v. Cerner Corp.*, 2007 U.S. Dist. LEXIS 63566 at *14 (W.D. Mo. 2007) (software engineer); *Lutz v. Ameritech Corp.*, 2000 U.S. App. LEXIS 3218 at **5-6 (6th Cir. 2000).
[3] *In re Wells Fargo Home Mortgage Overtime Pay Litigation*, 571 F.3d 953 (9th Cir. 2009); *Vinole v. Countrywide Home Loan, Inc.*, 571 F.3d 935 (9th Cir. 2009).

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION - CASE NO. 08-2670 CW**

## II.    FACTS AND PROCEDURAL HISTORY

### A.    <u>Procedural History</u>

Plaintiffs filed this action on May 28, 2008, alleging overtime claims under the Fair Labor Standards Act ("FLSA") and California law, and derivative benefits claims under ERISA.  (Dkt. 1.)  On February 6, 2009, Plaintiffs amended their complaint to add overtime claims under Minnesota state law.  (Dkt. 70.)  Before moving for conditional certification of the FLSA claims, Plaintiffs caused notice to be sent to more than 2,400 current and former Wells Fargo ("WF") employees in 23 different jobs.  (Fife Dec. ¶ 2). On October 26, 2009, the Court conditionally certified Plaintiffs' FLSA collective action under the lenient first-tier "notice"-stage standard, (Dkt. 15), causing notice to be sent to 2,539 current and former WF employees in 30 different jobs.  (Fife Dec. ¶ 3).

### B.    <u>The Classes Plaintiffs Are Attempting To Certify.</u>

Plaintiffs now seek to certify three classes:  (1) exempt employees in California holding any of 26 different jobs beginning four years from the date the Complaint was filed (the "Proposed California Class"); (2) exempt employees in Minnesota holding any of 26 different jobs beginning three years from the date the Complaint was filed (the "Proposed Minnesota Class"); and (3) exempt employees nationwide holding any of 26 different jobs beginning six years from the date of the filing of the Complaint (the "Proposed Nationwide ERISA Class").  Each of the 26 jobs is characterized by both a job family (e.g., "Network Engineer" or "Operating System Engineer") and a job level (e.g., "Level 4").  The duties of the individual employees vary substantially based on job family, job level, areas of geographic responsibility, business unit, and individual expertise.  (Lehan Dec. ¶ 2).

The Proposed California Class has more than 1,340 potential members.  (Fife Dec. ¶ 4).  Out of 675 individuals in California who were sent notice of the overlapping FLSA action, only 97 opted in.  The Proposed Minnesota Class has more than 640 potential members.  (Fife Dec. ¶ 5).  Out of 525 individuals in Minnesota who were sent notice of the overlapping FLSA action, only 42 opted in.  The Proposed Nationwide ERISA Class has more than 2,900 potential members.  (Fife Dec. ¶ 6).  Out of 2,539 individuals who were sent notice of the overlapping FLSA action, 282 opted in.  (Id.)

Adjudication of the legal issues raised by the Proposed California Class would require application of the California overtime laws.[4]  Adjudication of the legal issues raised by the Proposed

---

[4] Plaintiffs suggest in passing that California meal and rest periods are a common legal issue.  Pl. Br.

2

1   Minnesota Class would require application of the Minnesota overtime laws.  Adjudication of the

2   legal issues raised by the Proposed Nationwide ERISA class would require application of ERISA,

3   the FLSA, and the overtime laws of each of the 38 states encompassed by the proposed class.[5]

4   **C.   WF's Exemption Determinations Are Based On Individualized Assessments**

5          Plaintiffs concede WF did not make a single, blanket decision to uniformly classify all

6   putative class members as exempt.  Rather, Plaintiffs acknowledge WF made separate "corporate

7   assessments of their job duties," and "classified them as exempt or non-exempt" on the basis of

8   those assessments.[6]  In fact, the exempt status of the putative class members was determined based

9   on fact-specific assessments of job duties and of individual employees within job titles.[7]  Between

10  2004 and 2008, WF conducted audits to evaluate the functions of several positions at issue, as well

11  as the actual duties performed by individual employees in certain of those positions. WF determined,

12  among other factors, (1) whether the duties associated with a position required employees to spend

13  more than 50% of their time engaged in exempt work and required customary and regular exercise of

14  discretion and independent judgment, and (2) whether each particular employee in the position spent

15  more than 50% of his or her time engaged in exempt work, and customarily and regularly exercised

16  discretion and independent judgment.[8]  Some positions, such as TSS 3, were reclassified as non-

17  exempt, while others, such as NE 3, remained exempt.[9]  In positions that remained exempt, some

18  employees were left in those positions and thus remained exempt, while others were moved into

19  non-exempt positions and reclassified as non-exempt, based on individual determinations.[10]

20
21  at 7.  Plaintiffs have not provided any evidence or argument supporting certification of a California
    meal and rest period class. The meal and rest break claims are, at any rate, derivative of the overtime
    exemption claims, and also require individualized inquiries in their own right.  *Brown v. FedEx*
22  *Corp.*, 249 F.R.D. 580,587 (C.D. Cal. 2008); *Gabriella v. Wells Fargo Financial, Inc.,* 2008 WL
    3200190 at *3 (N.D. Cal. 2008); *Hostetter v. Barnes & Noble*, CV 09-1572-VBF (SSx) (C.D. Cal.
23  Jan. 25, 2010). *See, e.g.*, Alvarez Dec. (CA) ¶ 7; Babey Dec. (CA) ¶ 12; Olonzo Dep. (CA) 57:14-
    59:4.
24  [5] This brief denotes evidence from California employees with (CA), and from Minnesota employees
    with (MN).  Citations to declarations with no state noted involves employees from other states.
25  [6] Pl. Br. at 4.  Within each job family, some jobs are classified as exempt, and others as nonexempt.
    Lehan Dec. ¶ 2.
26  [7] The exempt status of each job was initially determined when created.  Dougherty Dep. at 106:2-7.
    The exempt status of many was later reevaluated.  Grubb Dec. ¶ 3; First Dougherty Dec. ¶¶ 2, 3, 4.
27  [8] First Dougherty Dec. ¶¶ 2, 3, 4, 5, 9, 10, 11, 12, Ex. A-R.
    [9] First Dougherty Dec. ¶¶ 2, 3, Ex. A-F.  The Network Engineer 3 position was later deactivated, and
28  the individuals in that position reviewed individually.  First Dougherty Dec. ¶¶ 9, 10, 11, 12.
    [10] First Dougherty Dec. ¶¶ 2-8, Ex. A-O; Opt-in Brox Dec. (CA) ¶ 15 ("roughly half of the TSSs on
    my team were reclassified from exempt to non-exempt… I was not").

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION - CASE NO. 08-2670 CW**

**D.** **Substantial Variation In Job Duties Is Reflected In Customized Job Descriptions.**

WF does not use standardized job descriptions because individual employees have unique responsibilities that often require unique qualifications.  WF uses base templates for each of the 26 jobs, which differ significantly because the job duties vary substantially from job to job.  The job descriptions used for individual employees vary even further, as managers customize and edit them for particular positions.[11]  The job duties of individual employees diverge even further in practice, as business needs and individual abilities cause employees to specialize, or to be given more or fewer responsibilities in ways that alter the nature and mix of their job duties.[12]  Several Plaintiffs testified WF's template job descriptions do not accurately reflect how they actually spent their time at work.[13]

**E.** **Job Duties Varied Significantly Between Employees In Different Job Titles.**

Each job title has significantly different job responsibilities and roles.  Class members not only had widely varying job duties, but also spent varying amounts of time performing exempt tasks:

| Position | Diversity of Job Duties Between Job Titles |
| --- | --- |
| ISA 4 | • My "primary duty was to protect the company from outside attacks on its computer systems."  Alexander Dec. (MN) ¶ 2. |
| OSE 5 | • "I spend the majority of my time, probably around 70%, doing 'Engineering' tasks [such as] designing, monitoring and analyzing data… ."  Mersy Dec. (MN) ¶ 21.<br>• "I spend approximately 40% of my working time researching and resolving problems such as hardware failures and task failures."  "I also spend approximately 30% of my time managing large projects." J.W. Dec. (MN) ¶¶ 5, 9.<br>• As a OSE 5, Foster spends at least 30-40% of his time configuring F5 load balancers, but did not do any load balancing as a NE 5.  Foster Dep. (CA) 21:8-22:8, 25:20-26:4, 34:16-34:25.<br>• "I am a team lead, which means that I spend less time on the technical side of things, and focus more on strategic planning of how to support the internal development of technology solutions."  Wendt Dec. (MN) ¶ 4.[14] |
| NE 4 | • "I am responsible for designing and writing software based on objectives provided by various groups within Wells Fargo."  "Software development involves 'beginning to end' responsibility, meaning that I am responsible for conception of the design to writing the code to testing and implementation."  Alvarez Dec. (CA) ¶ 4.<br>• As a Network Engineer 4, "I spend the majority of my work time identifying and trying to resolve chronic network problems." Boone Dec. (CA) ¶ 3. |
| NE 5 | • "I was responsible for researching and designing the architecture for the company network."  "I was able to make policy regarding these designs... ."  "I was given a team of employees (including other [NEs]) … which I supervised and directed … I also had the authority to fire or recommend… termination… ."  B.K. Dec. (CA) ¶¶ 4, 6-7. |
| WSE 5 | • My "primary job duty is to design the architecture of computer software applications |

---

[11] Lehan Dec. ¶¶ 5, 8; Pl. Br. at 19 (acknowledging WF uses leveling guides to place employees in jobs, and determine exempt status, "based on what they do.")

[12] Miranda Dec. (CA) ¶¶ 10, 14, 19, 20; D.K. Dec. (MN) ¶ 13.

[13] Plaintiff Cooper Dep. (CA) 194:11-195:22; Sharma (CA) Dep. 188:11-189:5; Hamilton Dep. 171:7-173:4; Vahanian (CA) Dep. 176:6-178:2, Ex. 12.; Foster Dep. (CA) 112:8-122:15, Ex. 9.

[14] *See also*, Munson Dec. (MN) ¶ 11 ("I spend approximately 25% of my time on workflow coordination" of 30 other people on my team.)

4

| | | infrastructure that connects other software components or applications." "I recommend improvements or upgrades to our systems, advice on new equipment, and also provide feedback on the performance of other Web Support Engineers on my team." J.D. Dec. (CA) ¶¶ 5, 20. |
|---|---|---|
| | WSE 6 | • "As a Team Lead, I am in charge of managing ten other Web Support Engineers." "I oversee the scheduling of the employees that report to me; I ensure that all the projects are getting assigned to the right people; I train employees; I attend every project meeting… ; I ensure that my group is staying on top of their projects and achieving their deliverables (i.e., their tasks and assigned projects, like code programming and script writing) on time; and I serve as an 'escalation point' for other employees when they need a higher level of expertise to deal with a problem. I spend 70% of my time dealing with these supervisory tasks." Miranda Dec. (CA) ¶¶ 4, 8. |
| | TSS 4 | • "Currently, my primary function is to proactively monitor systems to identify problems, and then manage the processes necessary to ensure that problems are resolved." Lindvig Dec. (AZ) ¶ 4. |

**F.    Job Duties Varied Significantly Between Employees Within The *Same* Job Title.**

The following demonstrate the wide variation of job duties within job titles:

| Position | Variation of Job Duties Within Same Job Title |
|---|---|
| ISA 4 | • "Even though my title at [WF] was [ISA 4], which I shared with others, I often found at Wells Fargo that your [HR] title and what you actually did were quite disconnected. So while I shared the title of [ISA 4] with other employees, up until… I was leading a team of employees performing anti-virus support, I was the only employee… I knew of who was performing anti-virus work." Alexander Dec. (MN) ¶ 3.<br>• My "job position requires me to analyze processes within [WF] and compare them to processes with another bank that we have recently purchased. I use my experience and technical knowledge to review and analyze the two sets of processes, to determine which processes work best and should be adopted for use." Dailey Dec. (MN) ¶ 2. |
| OSE 4 | • "My primary duty is to engineer applications.  To do so, I apply systems analysis techniques and procedures, including consulting with users, to determine software functional specifications." Larson Dec. (MN) ¶ 6.<br>• As a team lead, "a large part of my day is spent in meetings participating in the design and planning of systems and allocating resources." "My primary duty is to participate in a process of continuous improvement." Munson Dec. (MN) ¶¶ 5, 6. |
| OSE 5 | • "My primary function is to gauge 'capacity performance' to ensure… there is enough capacity in the system to handle the Bank's transaction load." Albergo Dec. (CA) ¶ 4.<br>• I control mainframe data by "(a) using systems analysis skills to create sophisticated resolutions to complex and unique problems; and (b) managing a team of employees and vendors who are executing a work plan I designed." Aswegan Dec. (MN) ¶ 3. |
| OSE 6 | • My primary role "is to support the systems and computers that run Wells Fargo's ATMs and Point of Sale services. To me 'support' means analyzing and resolving problems the systems encounter and anticipating new problems and acting proactively to prevent those new problems." Vaughn Dec. (CA) ¶ 2.<br>• I spend more than 50% of my… time supporting the database system, meaning (a) "I analyze the performance of the bank's mainframe; (b) I tune the mainframe to make it run faster; (c) I design and build new databases; and (d) I manage a team of employees and vendors who are executing a work plan… I designed." Hoium Dec. (MN) ¶ 4. |
| NE 3 | • "I acted as the key point person for all telecom vendor relationships." Rogers Dec. ¶ 5<br>• As a NE 3, "I was part of a small group… responsible for all… technology needs of our business unit, I was responsible to plan for our technology needs and acquisitions. I had to decide when we acquired new technology or equipment what our future plans for growth were, and how to factor… cost for potential expansion..." Vang (MN) Dec. ¶10. |
| NE 4 | • "On the development side, I am responsible for designing and writing software based on objectives provided by various groups within Wells Fargo." Alvarez Dec. (CA) ¶ 4.<br>• "My primary job function at Wells Fargo is to oversee and supervise the installation and de-installation of computer equipment, both hardware and software, at new and |

5

| | |
|---|---|
| | existing branches of Wells Fargo Bank." Babey Dec. (CA) ¶ 3 |
| NE 5 | • "My primary job function at Wells Fargo is to ensure adequate and proper functioning of Wells Fargo's entire network… over the last six years, I have always spent close to 99% of my time as a Network Engineer making decisions that require the use of my independent judgment and creative technological skills. Hickey (CA) Dec. ¶¶ 3, 9.<br>• B.K. had management responsibilities including supervising a crew of four. He alone was responsible for hiring employees onto his team and had "the authority to fire or recommend the termination of my team members, if necessary." B.K. Dec. ¶ 15.<br>• "I am responsible for high end design of the Layer 1 physical media for… core data centers." "I am responsible for… initial design of a data center…, for 'planning out' the data center so that it can house the necessary equipment." Bristol Dec. (MN) ¶¶ 3, 4.[15] |

**G.  The Three Named Plaintiffs Were All NE 4s, Yet They Performed Different Job Duties.**

While Plaintiffs seek to certify broad classes encompassing 26 different jobs, all three named Plaintiffs were employed in a single job: "Network Engineer 4."[16]  The evidence demonstrates the three named Plaintiffs have different job duties from each other and from the entire class of NEs and other non-NE positions at issue, and spent varying amounts of time performing different tasks.

| Plaintiff Schilling (MN) | Plaintiff Cooper (CA) | Plaintiff Lewis (CA) |
|---|---|---|
| · 50-75% of her job involved crawling under desks and "plugging in" computer hardware. Most of her work time was spent "in the field."[17] | · 50% of his job involved participating in meetings, the "primary purpose" of which was to understand the technical requirements of his internal WF customers (i.e., systems analysis work).<br><br>· Other primary duties included "testing the functionality" of his work, as well as configuring firewalls by entering commands into a management console.[18] | · In 2004, he was performing duties he associated with higher-level employees, such as unilaterally making changes to the network firewall, and "administrative" duties often performed by his manager.<br><br>· By early 2005, he was no longer permitted to make changes independently to the firewall, and he lost his administrative responsibilities.[19] |

**H.  The Mix Of Job Duties For Many Putative Class Members Varied Significantly From Week To Week and Over Time.**

The mix of putative class members' job duties varied significantly over time, and in some cases varied significantly from week to week:

---

[15] *See also* Corado Dec. (CA) ¶ 12 ("Primarily, I focus on infrastructure management, business continuity planning, and information security for the Phone Bank's reporting environment."); Neumann Dec. (MN) ¶ 7 ("In addition to managing and supporting the unit's telecommunication systems... my other main function in the WMT Group is to act as the group's primary telecommunications architect."); *see also*, Olonzo Dep. (CA) 22:8-25 (he was "unique" in his position because he worked on both application engineering and software engineering.)

[16] Plaintiff Cooper Dec. (CA) ¶ 4; Plaintiff Schilling Dec. (CA) ¶ 4; Plaintiff Lewis Dep. (CA) 21: 11-13.  Declarations marked "Plaintiff" or "Opt-in" refer to those filed by Plaintiffs. (Dkt. 227)

[17] Plaintiff Schilling Dep. (MN) 54:9-55:6, 96:3-9.

[18] Plaintiff Cooper Dep. (CA) 46:18-48:2, 72:7-73:14,156:24-158:8, 159:25-160:5, 164:3-22, 167:15-168:1.

[19] Plaintiff Lewis Dep. (CA) 25:5-26:18, 29:8-30:3;100:3-101:7.

6

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION - CASE NO. 08-2670 CW**

| Position | Varying Mix Of Job Duties |
|---|---|
| NE 5 | "For the past year and a half, I have been the technical lead in our Minneapolis testing lab.  For the four years before that, I acted as a liaison between engineers and management in the context of identifying, researching, and making recommendations for network solutions." S. Johnson Dec. (MN) ¶ 3. |
| NE | "When I first arrived at Wells Fargo, there were several aspects to my job including bringing up firewalls, making changes to firewalls, and working on Unix machines and load balancers in the firewall area."  "In my last year at Wells Fargo, my focus turned to the Secure Perimeter Architecture Project ("SPA Project"). . . . During this year, I analyzed rules, determined the applications that needed to communicate, performed rule cleanups, and deployed equipment and network changes to reroute traffic through new equipment."  Gress Dec. (MN) ¶¶ 5, 10. |
| OSE 4 | "In recent months, my primary activities have changed.  Until November 2009, I was primarily responsible for packaging new applications, or upgrades or changes to applications.  [When] I was primarily engaged in packaging, I spent approximately 75% of my time on packaging.  I now spend the majority of my time on quality assurance of the packaging done by someone else."  Larson Dec. (MN) ¶ 7.[20] |

## I.   The Named Plaintiffs' Claims Differ From The Claims Of Reclassified Employees.

None of the named Plaintiffs were reclassified from exempt to non-exempt, paid back pay, or subject to a release.  However, they seek to represent individuals who were reclassified from exempt to non-exempt, completed hours surveys, and were provided with back pay if they indicated they worked overtime.  The named Plaintiffs' claims are fundamentally different from reclassified employees' claims, and reclassified employees' claims too differ from one another.  Many accurately reported their hours on the surveys, and have been fully compensated for any overtime.[21] On the other hand, individual factual issues have already arisen with respect to 10 California Opt-ins and 3 Minnesota Opt-ins who now claim they worked more hours than they reported when they completed their surveys.[22]  Resolving these claims will require fact-intensive individualized inquiries into the circumstances under which they completed the surveys, the credibility of the reasons they

---

[20] *See also*, Simons Dep. (CA) 33:16-34:3 (spent approximately 50% of last year on a project in which he was the "primary engineer" migrating computers in bulk from one domain to another.); Sterns Dep. (CA) (rough) 56:15-24, 69:9-70:7 (during the time he was a team lead, he spent about 30-35% of his time balancing the workloads of other employees and about 20% mentoring other employees.)

[21] *See, e.g.*, Simons Dep. (CA) 12:16-13:5 (was told to and did fill out the hours survey "honestly and to the best of [his] ability," and received back pay based on that survey, when reclassified from PC/LAN Engineer to Operating Systems Engineer 5.); Dougherty Dec (*Russell*), ¶15; Second Dougherty Dec. ¶ 2, Ex. S.

[22] Opt-in Clark Dec. (CA) ¶ 19, Opt-in Donovan Dec. (CA) ¶ 26, Opt-in Dunne Dec. (CA) ¶ 21, Opt-in Glover Dec. (CA) ¶ 26, Opt-in LaMotte Dec. (CA) ¶ 19, Opt-in Morse Dec. (CA) ¶ 23, Opt-in Santos Dec. (CA) ¶ 20, Opt-in Boche Dec. (MN) ¶¶ 22, 23, Opt-in Prenevost Dec. (MN) ¶ 24 (but see, Prenevost Dep. 127:14-128:1, 128:2-132:2, 134:4-15; 126:24-132:2 (no one forced or pressured him to sign hours survey, understood the form directed him to call HR with questions, no one told him to understate hours); Opt-in Shirley Dec. ¶ 18; *see also*, Second Dougherty Decl., ¶¶ 2, 3, 4, Ex. T, U, V (employees paid backwages for all hours reported.)

7

now provide for allegedly not reporting the hours they worked accurately, and any evidence that tends to show the hours they actually worked.

### III.   EXEMPTION CRITERIA AT ISSUE

Four different California exemptions – the administrative exemption,[23] executive exemption,[24] computer programmer exemption,[25] and combination exemption[26] – apply to the Proposed California Class.  Four Minnesota exemptions – the administrative exemption I & II[27] and the executive exemption I & II[28] – apply to the Proposed Minnesota Class.[29]  Because Plaintiffs' ERISA claims depend on proof that putative class members were not credited with all the wages to which they were entitled under applicable state and federal laws, several FLSA exemptions and the overtime exemptions of 38 different states apply to the proposed ERISA class.

### IV.   ARGUMENT

A trio of recent decisions denying class certification in overtime exemption cases – two from the Ninth Circuit and one from the Northern District of California – preclude any possibility that class certification is warranted.  *See In re Wells Fargo*, 571 F.3d 953 (9th Cir. 2009); *Vinole v. Countrywide Home Loans*, 571 F.3d 935 (9th Cir. 2009); *In re Wells Fargo*, 2010 WL 174329 (N.D. Cal. Jan. 13, 2010) (Judge Patel).  These cases establish that, because exempt status usually can be resolved only through individualized inquiries, *In re Wells Fargo*, 571 F.3d at 959, class certification is appropriate in such cases only if Plaintiffs identify some form of common proof that would "absolve th[e] court from inquiring how each [employee] spent their working day."  *In re Wells Fargo*, 2010 WL 174329 at *7.  Plaintiffs have not done so.  At most, Plaintiffs have presented evidence indicating that **some** WF employees are subject to **some** policies and procedures that **sometimes** limit their discretion with respect to **some subset** of their job duties.  Plaintiffs have done nothing to show how the scattershot list of policies they identify would allow the exempt status of the putative class members to be jointly adjudicated.  Moreover, none of the identified policies apply

---

[23] IWC Wage Order No. 4-2001 § 1(A)(2).
[24] IWC Wage Order No. 4-2001 § 1(A)(1).
[25] Cal. Labor Code § 515.5.
[26] *Hill v. R+L Carriers, Inc.*, 2010 WL 334853 at *6 (N.D. Cal. Jan. 22, 2010) ("California appears to recognize a similar 'combination' exemption.").
[27] Minn. R. 5200.0200.
[28] Minn. R. 5200.0190.
[29] Under all Minnesota exemptions, the "primary duties of the employee are determinative of his or her status."  Minn. R. 5200.0180.

8

uniformly to the entire class, as their application varies significantly depending on an employee's job duties. The record in fact shows that many putative class members regularly exercised independent discretion and judgment while performing a variety of exempt job duties,[30] evidencing a clear "**lack** of issues subject to common proof that would actually ameliorate the need to hold several hundred mini-trials with respect to each [employee's] actual work performance." *Vinole*, 571 F.3d at 947 (emphasis added). Plaintiffs have not carried their burden, and certification must be denied.

### A.   **Plaintiffs Bear the Burden of Proving that a Class Can Be Certified**

"The party seeking class certification bears the burden of establishing that the requirements of Rules 23(a) and 23(b) have been met." *In re Wells Fargo*, 2010 WL 174329 at *5; *Vinole*, 571 F.3d at 944 n.9. Plaintiffs must show that their proposed classes satisfy the four requirements of Rule 23(a) and at least one requirement of Rule 23(b). The trial court must conduct a "rigorous analysis" to determine whether the requirements of Rule 23 have been met. *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

### B.   **The Proposed Statewide Classes Cannot be Certified Under Rule 23(b)(3) Because Individual Issues Predominate and a Class Action is Not Superior**

Plaintiffs have failed to make either of the two showings required to certify the statewide overtime classes under Rule 23(b)(3). *Predominance* requires that questions of law or fact common to the members of the class predominate over questions affecting individuals. *Superiority* requires that a class action is superior to other available methods for adjudication of the controversy.

#### 1.   **In Determining Predominance, the Court Must Focus On Whether Exempt Status Can Be Adjudicated On A Classwide Basis**

"The predominance inquiry of Rule 23(b)(3) asks whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *In re Wells Fargo*, 2010 WL 174329 at *4 (internal quotation marks omitted). Plaintiffs, who bear the burden of proof, must show "how the class trial could be conducted." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). In assessing whether a class trial is feasible, the trial court "must formulate some prediction

---

[30] *See* Section II (E)-(F), *supra*; Section IV (B)(3), *infra*, and accompanying footnotes. In particular, the voluminous records of WF's audits show that WF collected information on the exact nature of each individual employee's particular duties, with personal variations noted, and the approximate percentage of time individual employees spent on each, to be used in determining exempt status. First Dougherty Dec. ¶¶ 2-12, Ex. A-R.

9

as to how specific issues will play out in order to determine whether common or individual issues will predominate in a given case." *In re Wells Fargo*, 2010 WL 174329 at *5.

*In re Wells Fargo* and *Vinole* establish that individualized issues will be considered to predominate in exemption cases unless Plaintiffs demonstrate that adjudication of exempt status of the class is possible by common proof.[31] The mere existence of common issues is not enough: Plaintiffs must identify uniformly applicable corporate policies that will "absolve th[e] court from inquiring into how each [employee] spent their working day." *In re Wells Fargo*, 2010 WL 174329 at *7. Plaintiffs concede they must demonstrate that a classwide adjudication of exempt status is possible for certification to be warranted.[32] If the court would still be required to examine how each employee "performed his or her job" despite alleged common proofs, class certification must be denied because such individualized inquiries "would inevitably consume the majority of a trial, and overwhelm the adjudication of common issues." *In re Wells Fargo*, 2010 WL 174329 at *7.[33]

### 2. The Substantial Variations in Job Duties Both Between And Within Job Titles Require Denial of Class Certification

---

[31] *In re Wells Fargo*, 2010 WL 174329 at *6 ("when an employer asserts an exemption as a defense . . . unless plaintiff proposes some form of common proof . . . common issues of law and fact are unlikely to predominate"); *Vinole*, 571 F.3d at 946-47 (endorsing the trial court's holding that "where exempt status depends upon an individualized determination of an employee's work, and where plaintiffs allege no standard policy governing how employees spend their time, common issues of law and fact may not predominate").

[32] Pl. Br. At 10 ("The core issue here is whether the Class members were properly classified as exempt. Class treatment is appropriate if this issue is susceptible to common proof."); *Id.* at 20.

[33] *See also Jimenez v. Domino's Pizza*, 238 F.R.D. 241, 251 (C.D. Cal. 2006) (no predominance of common question where "there were many variable[s] which affected a particular manager's mix of duties"; "the predominating issue in this case is the actual mix of duties worked which entails a need to conduct an individual inquiry for each class member"); *Perry v. U.S. Bank*, 2001 WL 34920473, *7 (N.D. Cal. Oct. 16, 2001) (no predominant common question for proposed class of personal bankers "in light of the differences in individual job duties"); *Sepulveda v. Wal-Mart Stores, Inc.*, 237 F.R.D. 229, 249 (C.D. Cal. 2006) (no predominance of common question where there was "voluminous evidence that there actually was a great deal of variance in [assistant manager] duties"); *Pfohl v. Farmers Ins. Group*, 2004 WL 554834, *9 (C.D. Cal. Mar. 1, 2004) (stating that "[t]he differing job duties and the individualized inquiry to determine whether these varying duties meet the administrative exemption preclude a collective action in this case" and denying class certification of class of insurance adjusters); *Keller v. Tuesday Morning*, 179 Cal.App.4th 1389, 1399 (2009) (affirming decertification of class of store managers where mandated management policies were susceptible to classwide proof but time spent on exempt duties required individual inquiries); *Walsh v. Ikon Office Solutions, Inc.*, 148 Cal.App.4th 1440, 1459 (2007) (denying class certification and noting that "[an] inconsistency in the witnesses' accounts . . . underscores the likelihood that adjudicating [the case] will be best accomplished on an individual basis"); *Dunbar v. Albertson's, Inc.*, 141 Cal.App.4th 1422, 1431 (2006) (class treatment inappropriate where findings as to one grocery manager could not be extrapolated to 900 other managers due to significant variation in duties).

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION - CASE NO. 08-2670 CW**

The proposed statewide classes each consist of 26 different jobs from 11 different job families. The record establishes that different jobs are tasked with substantially different job duties, that job duties substantially vary among employees <u>within</u> each job, and that many job duties are exempt duties that require the exercise of discretion and judgment.[34]

To adjudicate the exempt status of the Proposed California Class, the court would be required to examine the job duties and mix of job duties of each individual California employee to determine whether any of four applicable exemptions – the administrative, executive, computer professional, and combination exemptions – apply. Because California imposes a quantitative 51% exempt work threshold for exemption, the court would also need to make week by week determinations of the mix of job duties for California employees to ensure they retained their exempt status as their projects and tasks changed. *See* Section II (H), *supra*. To adjudicate the exempt status of the Proposed Minnesota Class, the court would need to examine the job of each individual employee to determine whether the Minnesota administrative or executive exemptions apply.

This court has recognized that "[t]he determination of whether an exemption applies requires a fact-intensive inquiry." *Hill v. R+L Carriers, Inc.,* 2010 WL 334853 at *3 (N.D. Cal. Jan. 22, 2010). For example, "in the context of analyzing whether a California exemption applies, a court first 'examines in an individualized fashion the work actually performed by the employee to determine how much of that work is exempt.'" *Id.* at *4, *quoting Vinole*, 571 F.3d at 945. Given the substantial variation in job duties, the exempt status of hundreds or thousands of employees in 26 different jobs cannot be determined without "the need to hold several hundred mini-trials with respect to each [employee's] actual work performance." *Vinole*, 571 F.3d at 947.

### 3. Plaintiffs' Alleged "Common Proofs" Would Not Allow For Joint Adjudication Of Exempt Status

Plaintiffs seek to certify two unprecedented statewide mega-classes, each of which would consist of 26 different jobs from 11 different job families. Plaintiffs effectively concede that job duties vary significantly within each proposed class, but suggest classes can be stitched together by alleged "uniform policies and practices" of "general applicability" that apply "companywide." Pl. Br. at 1, 9. Plaintiffs bear the burden of proof on this issue, however, and they have not shown (and

---

[34] *See* Section II (E)-(G), *supra*; Section IV (B)(3), *infra*, and accompanying footnotes.

cannot show) that any of the alleged common policies (1) were in fact common to the entire class, (2) rendered the job duties of the putative class members uniform, or (3) impacted putative class members in a way that uniformly prevented them from performing exempt work. Plaintiffs have not shown that the alleged common proofs would allow the court to jointly adjudicate this case, and individualized fact-specific inquiries would inevitably predominate any attempt to try it.

### a. The alleged common proofs are not in fact common to the proposed classes

The alleged common proofs cannot serve as the basis of joint adjudication of exempt status, because Plaintiffs have not shown that any of them apply uniformly to all putative class members.[35] Many putative class members are not even aware of the alleged uniform policies.[36]  Others acknowledge WF distributes policies and procedures, but state they do not apply to them because their work is so unique.[37]  One class member *challenged* existing policies and created new ones.[38]

Here, there are no "comprehensive uniform policies" that "suggest a uniformity among employees" which can facilitate common proof. *In re Wells Fargo*, 571 F.3d at 958-59.  Plaintiffs have cited no support suggesting a corporate policy can serve as a "common proof" **unless** it is

---

[35] And, indeed, they don't. *See, e.g.,* Prenevost Dep. (MN) 29:3-17 (whether an employee used a particular document or resource depended on "the particular person and what they were trying to accomplish."). *See also* footnotes 36-51 and accompanying text.

[36] Simons Dep. (CA) 48:9-18, 49:8-50:8, 50:19-24, 51:20-52:5 (has not heard of Monsoon, EDNS-NAS Operations Manual, Data Center Implementation Group database, Import/Calculate Mark to Market Manual, Wall Street User Set Up, Create/Edit Portfolio Instructions, Corrections Request, Process Save Key Figure, Process QRM Activities, Tranche Aggregator, Frontline Documents, Application Tracker, Security Plan Template, General Nelson, ART, or End User Computing Library.); Prenevost Dep. (MN) 78:8-80:7 (did not use Data Center Implementation Group Database; EDNS-NAS Operations Manual, Monsoon System, TIM Runbook, Firewall Conversion Script); Foster Dep. (CA) 61:9- 62:10, 63:4-19 (did not use Wall Street User Setup, Create/Edit Portfolio Instructions, BNY user Setup, Corrections Request, Process Save Key Figure, Process QRM Activities, Tranche Aggregator, Frontline Documents, Application Tracker, General Nelson, Tree Ticket System, End User Computing Library, or Server Build Manual); *see also,* Larson Dec. (MN) ¶ 22; Vaugh Dec. (CA) ¶ 11; Gress Dec. (MN) ¶ 22; Vaughn Dec. (CA) ¶ 11.

[37] Alvarez Dec. (CA) ¶ 4 ("[My work] is all custom work that can only be performed through the use of independent discretion and judgment."); Boone Dec. (CA) ¶ 3 ("My job requires me to define the undefined. There is no template or manual for me to follow."); Johnson Dec. (CA) ¶ 7 ("Virtually all of my time is spent on issues such as analyzing proposals, testing potential solutions, or analyzing and recommending improvements . . . None of my work can be automated, or performed by reference to a script or manual."); P. Garrett Smith Dec. ¶ 8 ("The high-level problems that I am called upon to solve are not routine, and could not be solved by reference to a simple manual, or 'how to' guide."); Watson Dec. ¶ 4 ("The majority of my design work is specialized and cannot be performed by reference to any 'template' because the designs and network needs are constantly changing."); L.T. Dec. ¶ 7 ("Because my team first developed and implemented the Genesys program . . . we did not have any established procedure to rely on.").

[38] B.K. Dec. (CA) ¶¶ 6-7 ("I informed my superiors that the design someone else had created simply would not work. I then personally redesigned and reengineered the entire design, at which point I proved my abilities to take charge of such design work, which I did from that point forward.").

---

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION - CASE NO. 08-2670 CW**

common to the entire class and relevant to the exemption inquiry.  Every case Plaintiffs cite in which an overtime exemption class was certified involved only **one** job title, and the identified policies were both relevant to the duties at issue and applied to **every employee in that job title**.[39]

Plaintiffs have not shown that **any** of the alleged common proofs applied to every employee in the proposed mega-classes, or even to all of the employees in any of the 26 job titles.  In fact, the record shows the contrary:

- Many employees did not use "operating manuals" or other written instructions;[40] employees who did used different manuals depending on what tasks they were performing;[41]

- Many employees were not subject to change control procedures;[42] employees who were, were subject to different change control procedures;[43] and where change controls applied to an employee, they often applied to only a discrete portion of the employee's job duties;[44]

---

[39] *See Tierno v. Rite Aid Corp.*, 2006 WL 2535056 at *6-7 (N.D. Cal. Aug. 31, 2006) ("training is the same for all Store Managers . . . [a]ll Store Managers must adhere to the operations manual equally . . . Store Managers perform essentially the same tasks . . . Rite Aid fosters homogeneity"); *Alba v. Papa John's USA, Inc.*, 2007 WL 953849 at *10-12 (C.D. Cal. Feb. 7, 2007) ("Operations Manual was used throughout each of their California stores and governed how each Papa John's restaurant should be run . . . It also contained a daily checklist for managers . . . Defendants used a uniform training program); *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 159 (S.D.N.Y. 2008) ("[Defendant] conceded that the business practices at issue in the case are uniform among its stores . . . [Defendant] also has a single 'Employee Rules Handbook' . . . each store has the same exact policy as every other store . . . the job responsibilities for assistant managers are largely and materially consistent").

[40] *See* Babey Dec. (CA) ¶ 3 ("There are no manuals or written guidelines I go to . . . I independently assess the situation and choose from varying courses of conduct to come up with my own solutions."); Hickey Dec. (CA) ¶ 3 ("[T]here are no manuals that give me a blueprint . . . [r]ather, I rely on my extensive background and computer technology expertise to assist me in making independent decisions and exercising my own judgment."); Wendt Dec. (MN) ¶ 24 ("The work I do is so fluid that I don't refer to written resources very often."); Miranda Dec. (CA) ¶ 17 ("80-90% of the time, I cannot foresee what problems will arise with an application, and the problems are so different that the guide is not helpful."); Gress Dec. (MN) ¶ 20 ("There are certain tasks that I performed for which there were no documented resources available to me."); Munson Dec. (MN) ¶ 14 ("For the most part, my job does not require procedures at all.  My job is to come up with ideas and engineer them."); Vaughn Dec. (CA) ¶ 8 ("When I engage in any aspect of my job, be it problem solving or programming, I am not relying on any internal or external manual or guidebook to tell me what to do or how to perform.  I do not work off of a checklist, flowchart, or manual."); J.W. Dec. (MN) ¶ 8 ("My job is to resolve problems that are <u>not</u> covered by such resources.").

[41] *See, e.g.,* J.W. Dec. (MN) ¶ 7 ("Although I may sometimes refer to secondary manuals or resources for guidance, these manuals are typically not provided by Wells Fargo and I only refer to them to help me come up with creative and unique solutions to complex problems.  The solutions to the problems I encounter are almost never directly addressed in any secondary manuals or resources."); Foster Dep. (CA) 59:11-60:13 (uses the Data Center Implementation Group Database anywhere from once a week to once every two months, dependent on the project.); Simons (CA) Dep. 52:16-53:24 (uses the server build manual to build servers, each server takes two to eight hours to build, and has only built 12 in the last year, and 20 each year in the two years prior.); Larson Dec. (MN) ¶ 21.

1    • Many employees received only a small fraction of their work, if any, through ticketing

2    systems;[45] those who did receive work through ticketing systems received them through different

3    ticketing systems depending on factors such as job title and work projects;[46] some employees

4    assigned ticketed work to others, rather than receiving work themselves from the ticketing systems;[47]

5    the amount of an employee's work received through the ticketing systems varied.[48]

6    • SLAs set forth response time goals or systems performance goals;[49] many class members

7    were not subject to SLAs;[50] those who were subject to SLAs were subject to different SLAs

8    depending on factors such as job title and work projects.[51]

9

10   [42] Ramczyk Dec. ¶¶ 2, 3; Hawkinson Dec. ¶ 3 ("None of the TSS4s that I managed were subject to
     Well Fargo's Technology Change Control processes."); R. Andrashko ¶¶ 2, 3 (None of the NE 4s,
     NE 5s, and NE 6s "that I manage are subject to Wells Fargo's Technology Change Control

11   processes."); S. Johnson Dec. ¶ 22 (MN) ("The change control procedures very rarely impact me at
     all. … The last time I dealt with change control procedures was March 2009."); Munson Dec. (MN)

12   ¶ 23 ("I do not deal with the change control procedures very often." "I make production change
     requests a couple times a year); see also, Routh Dec. ¶¶ 2, 3.

13   [43] Larson Dec. (MN) ¶¶ 23, 24 ("I rarely utilize the production change control procedures, because
     the applications packages that I create, package, and/or QA are put on a server and do not affect

14   production. Other groups actual [sic] push the packages out and those groups will make the
     production change request."); Wendt (MN) Dec. ¶ 18 ("I can and do make changes to an individual

15   server without going through the change control process, as long as I am making a change to an
     application that is already in production.")

16   [44] Donohue Dec. ¶ 2, 3, 4; Munson Dec. ¶ 23 ("Only a small part of my job involves the
     change control procedures."); Prenevost Dep. 107:23-108:3 ("less than 10 percent" of time was

17   devoted to work that required him to deal with change records); Foster Dep. (CA) 130:3-8 (30-40%
     of work comes through a change request); J.D. Dec. (CA) ¶ 16 ("I estimate that 90% of my time is

18   spent in the pre-production stage of designing systems, so change control standards affect much less
     than 10% of my working time."); Vandenberg Dep. 88:11-16; see also, Primavera (CA) Dep. 36:3-

19   21 (peer reviews change control work orders submitted by other employees and has a role in
     accepting or rejecting the changes that have been requested.)

20   [45] S. Johnson Dec. (MN) ¶ 20 ("None of my work comes to me through the PAC2000 system.");
     Wendt Dec. (MN) ¶ 16 ("I am not regularly assigned tickets in Pac2000."); Munson Dec. (MN) ¶ 15

21   ("On a monthly basis, I receive 1-2 hours of work through PAC2000"); Alexander Dec. (MN) ¶ 13
     ("The projects that I worked on came to me in different ways. Most of the projects I worked on, I

22   determined myself."); Vaughn Dec. (CA) ¶ 10 (received majority of assignments through
     supervisors, direct requests, and through his own judgment).

23   [46] Larson (MN) ¶ 8 ("[My project] requests come to me either through WANDA or the request
     center."); Alvarez Dec. ¶ 5 ("Approximately 50 problem tickets are generated to my team each week

24   through Remedy."); Crowder Dec. ¶ 5 ("I also was responsible for responding to requests for service
     or assistance, commonly known as 'trouble tickets' that are logged into our ticket system, called

25   'Footprint.'").
     [47] Simons Dep. (CA) 27:11-28:11, 31:19-32:16 (assigns work outside his area of responsibility to

26   other employees through the PAC2000 system, assigns menial tasks or tasks that should not have
     been assigned to his group in the first place to the desktop team through the TREE ticketing system).

27   [48] Foster Dep. (CA) 36:5-20 (receives 10 to 15 percent through PAC2000 trouble tickets); Gress
     Dec. (MN) ¶ 6 ("I received about half my requests through Pac2000 and half directly from

28   management.")
     [49] Prenevost Dep. (MN) 39:4-25; Lindstrom Dep. 42:5-9.
     [50] Munson Dec. (MN) ¶ 18 ("I don't know if there are SLAs on a business by business or application
     by application level that relate to the Wholesale group. If there are, they don't affect my job at all.").

14

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION - CASE NO. 08-2670 CW**

1   "[B]ecause there is no uniform policy or standard operating procedure upon which all [putative class

2   members] rely, it is likely that each [employee]'s experience is unique," and certification must be

3   denied.  *Mendoza v. Home Depot U.S.A., Inc.*, 2010 WL 424679 at *8 (C.D. Cal. Jan. 21, 2010).

4        **b.    The alleged common proofs do not render the job duties of the putative class
                 members uniform**

5        Exempt status under California and Minnesota law depends on the actual job duties

6   performed by employees.  For that reason, courts in the Ninth Circuit have certified overtime

7   exemption cases on the basis of common proofs **only** where the policies identified by Plaintiffs

8   clearly rendered the job duties of the putative class members uniform.[52]  Plaintiffs have not shown

9   that the alleged common proofs create uniformity in the job duties of the putative class members,

10  and in fact the clear evidence of substantial variation in job duties demonstrates that they do not

11  create such uniformity.  "Plaintiffs have offered no compelling evidence to suggest that the [standard

12  operating procedures] provide uniformity for the [employees]."  *Mendoza*, 2010 WL 424679 at *8.

13       **c.    Plaintiffs have not shown that the alleged common proofs prevent the putative
                 class members from exercising discretion and independent judgment**

14       Plaintiffs have not shown that any of the identified corporate policies prevent employees

15  from exercising independent discretion and judgment, and the record demonstrates they do not.[53]

16  _____

17  [51] Gress Dec. (MN) ¶ 27 ("[T]he work I performed in the first two years of my employment was not
    covered by a Service Level Agreement or Operating Level Agreement.  Once I began working on
18  the SPA project, that work was covered by an SLA."); Vahanian Dep. (CA) 161:18-162:12.
    [52] *See In re WellsFargo*, 571 F.3d at 958-59 ("Such centralized rules, to the extent they reflect the
19  realities of the workplace, suggest a uniformity among employees that is susceptible to common
    proof."); *Tierno*, 2006 WL 2535056 at *6-7 ("Store Managers perform essentially the same tasks . . .
20  Rite Aid fosters homogeneity"); *Alba*, 2007 WL 953849 at *11 ("tends to establish a uniformity
    throughout each of Defendants' stores, and thereby does not require extensive individualized
21  inquiries"); *Damassia*, 250 F.R.D. at 161 ("job responsibilities [are] materially consistent").
    [53] Wendt Dec. (MN) ¶ 8 ("In my role as a strategic planner, I am always trying to think of new and
22  better ways to operate the 3,400 servers all over the country from a central location."); Kota Dec.
    (CA) ¶ 19 ("There are some established practices, but I must make a judgment call on when and how
23  to apply them"); Munson Dec. (MN) ¶ 7 ("I was part of the team that decided an improvement in this
    process could be made, determined how to improve the process, and then made the improvement a
24  reality"); Babey Dec. (CA) ¶ 11 ("Most of my time as a Network Engineer for Wells Fargo is spent
    working independently and requires the use of my judgment and creative technological skills while
25  making logical decisions."); Boone Dec. (CA) ¶ 6 ("In both of my positions as an NE 3 and an NE 4,
    my primary duties required me to spend the majority of my time using independent judgment and
26  discretion, critical thinking, and analysis."); J.D. Dec. (CA) ¶ 19 ("My position requires me to
    constantly analyze information and make decisions based on the information I have and my 12 years
27  of knowledge and experience in the field.  I cannot rely on a manual or 'how to' guide to perform
    my tasks."); F.D. Dec. (CA) ¶ 8 ("I would completely disagree with any employee in my position
28  who says that they have to follow a very specific procedure and have no discretion on how they
    complete their work tasks.  As an analyst, my entire job function is to think creatively when looking
    at problems, and I cannot be constrained by strict rules or procedures."); Hickey Dec. (CA) ¶ 9 ("I
    have always spent close to 99% of my time as a Network Engineer making decisions that require the

                                                    15

While Plaintiffs might be able to show during the course of individualized adjudications that **some** class members were affected by **some** policies for **some** period of time in ways that prevented them from exercising discretion with respect to **some job duties**, they have not shown (and cannot show) that any of the identified policies stripped discretion and judgment from all putative class members.

### (i) The use of operating manuals does not prevent the exercise of discretion and independent judgment

Plaintiffs assert that WF keeps document repositories containing "design templates and instruction guides" that employees are required to follow when performing certain tasks. Pl. Br. at 14. The record shows the templates and instructions did not apply uniformly to all class members. *See* Section IV (B)(3)(a). Even if they did, however, they would not serve as a basis of common proof allowing for joint adjudication of exempt status because using operation manuals and instruction guides is not inconsistent with the exercise of independent discretion and judgment under any of the exemption tests. To the extent employees used such resources, they often relied on their specialized knowledge to understand and apply them.[54] Lawyers, for example, exercise significant discretion in drafting briefs despite having to follow the Federal Rules of Civil Procedure and local rules, and despite needing to consult Moore's Federal Practice.[55]

Case law addressing the effect of instructions and operating manuals on exempt status makes it clear that a fact-specific analysis is required to determine precisely how such policies affect the actual job duties of employees and their exercise of discretion and judgment. For example, in *Medepalli v. Maximus, Inc.*, 2008 U.S. Dist. LEXIS 28509 at *3 (E.D. Cal. 2008), the court acknowledged that the plaintiff technical worker "was required to follow [defendant's] established standards and templates as to appearance and operation of the final product," but determined that he nevertheless had "independence in determining how to develop the code."[56] Plaintiffs bear the

---

use of my independent judgment and creative technological skills."); D.K. (MN) Dec. ¶ 18 ("I make decisions on what changes should be made to file structures, what changes should be made to job design and how to configure new equipment that we purchase."); Primavera Dep. (CA) 94:13-95:9 (agreed with statements regarding his performance including "Never at a loss for creative and different way to attack thorny and ambiguous problem" and "has the technical knowledge, know-how and experience to take appropriate risks."); Olonzo Dep. (CA) 105:11-18 (made recommendations to management on how to improve a process or procedure on a regular basis.)
[54] For example, Vahanian Dep. 12:3-13:9 (relied on 15 years' experience); Larson Dec. (MN) ¶ 16 ("The checklist is meaningless without my knowledge and experience.")
[55] *See also* 29 C.F.R. § 541.207(c)(5) (2001) (HR managers often administratively exempt).
[56] *See also McAllister v. Transamerica Occidental Life Ins. Co.,* 325 F.3d 997, 1001 (8th Cir. 2003) ("Just because McAllister was required to follow detailed manuals does not mean she did not

16

burden of proof on class certification, and they cannot simply cite declarations showing that some WF employees sometimes used or were required to follow operating manuals, instructions, and design templates and call that common proof; rather, they are required to demonstrate to the court that the identified instructions constrained the discretion of the putative classes **as a whole** in a way that is relevant to determining their exempt status **as a whole**.  WF has provided detailed evidence showing that many members of the putative classes either were not bound by operating manuals or instructions, or were able to exercise significant discretion despite such instructions.  Plaintiffs have not carried their burden on this issue.

>            (ii)    **Change control procedures do not prevent the exercise of discretion and independent judgment**

Plaintiffs assert that WF's procedures requiring coordination and approval of changes to the technology systems provide a common proof that would allow for joint adjudication of exempt status.  Plaintiffs have not shown that change control procedures apply to all class members, and in fact they do not.  *See* Section IV (B)(3)(a).  Even if they did, however, all that Plaintiffs have shown is that WF's change control procedures do not allow WF employees to make unilateral changes to its technology systems without first consulting with and securing the approval of other potentially affected parties.  Plaintiffs have not shown that the change control procedures prevent WF employees from exercising independent discretion and judgment in creating and proposing system changes.[57]  Exempt employees – even Senate-confirmed federal agency executives – regularly function in environments with similar requirements.[58]  Not one of the overtime exemptions requires

---

exercise discretion and independent judgment."); *Haywood v. North Am. Van Lines Inc.*, 121 F.3d 1066, 1073 (7th Cir. 1997) ("Although North American does provide guidelines to the CSCs, we have examined these guidelines and do not find that they adequately constrain a CSC's actions to prevent him from exercising independent judgment."); *Lutz*, 2000 U.S. App. LEXIS 3218 at *8 (field engineer who argued that he "relie[d] on vendor manuals and internal documentation to perform his job duties working within pre-set guidelines created by Ameritech" nevertheless exercised independent discretion and judgment and was exempt administrative employee); *Murray v. Stuckey's Inc.*, 50 F.3d 564, 570 (8th Cir. 1995) ("standardized procedures and policies … may circumscribe but it does not eliminate the discretion of the on-site manager of an isolated store who is responsible for day-to-day operations."); *Heffelfinger v. Electronic Data Sys. Corp.*, 580 F. Supp. 2d 933 (C.D. Cal. 2008).
[57] Ramczyk Dec. ¶ 5, 6, 7; Donohue Dec. ¶ 5;  Prenovost Dep. (MN) 98:5-99:13; Wendt Dec. (MN) ¶ 21 ("The change control procedure does not prevent me from making a change, it just makes it harder to do.") Alexander Dec. (MN) ¶17; Gress Dec. (MN) ¶ 24; Foster Dep. (CA) 38:1-40:3.
[58] Executive Order 12866 (1993) ("Coordinated review of agency rulemaking is necessary to ensure that regulations are consistent with applicable law, the President's priorities, and the principles set forth in this Executive order, and that decisions made by one agency do not conflict with the policies or actions taken or planned by another agency").

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION - CASE NO. 08-2670 CW**

that employees have unilateral and final decision-making authority,[59] and Plaintiffs have failed to show that change control procedures prevent class members from exercising discretion, judgment, and creativity in crafting the system changes that are submitted to the change control process.

### (iii)   Ticketing and work assignment systems are not relevant to exempt status

Plaintiffs assert WF's ticketing systems constitute common proof because they are "used by Wells Fargo across the organization to assign work to Class members." Pl. Br. at 16. Plaintiffs have not shown that all class members received their work assignments through ticketing systems, and in fact many do not. *See* Section IV (B)(3)(a). Even if they did, the *method* by which assignments are distributed has no relevance to the actual duties employees must perform to complete those assignments.[60] The tickets themselves did not instruct an employee on **how** to perform his or her job duties.[61] Plaintiffs baldly assert a majority of tickets are "mundane, run-of-the-mill problems," Pl. Br. at 17, but make no showing that most such tickets are assigned to exempt employees, or that they are evenly distributed to class members in a way that might uniformly affect their exempt status.

### (iv)   Service Level Agreements are not relevant to exempt status

Plaintiffs assert that WF's Service Level Agreements (SLAs) and Operating Level Agreements (OLAs) constitute common proof because class members were required to "abide" by them and were "evaluated based on their compliance with them." Pl. Br. at 18. Plaintiffs have not shown that all class members were subject to SLAs, and in fact they were not. *See* Section IV

---

[59] *Bagwell v. Florida Broadband, LLC*, 385 F. Supp. 2d at 1316, 1325-26 (S.D. Fla. 2005) ("[p]laintiff recommended decisions that directly affected Florida Broadband's operations and financial future. Although Plaintiff did not have the ultimate authority to make these decisions, that does not defeat a finding that he exercised independent judgment and discretion"); *Burke v. County of Monroe*, 225 F. Supp. 2d 306. 319 (W.D.N.Y. 2002) (decisions "need not be final" to qualify as exercise of discretion and independent judgment"); *Massaro v. New York Times, Inc.*, 1988 WL 59637 at *3 (S.D.N.Y. 1988) ("[t]hat an employee's decisions may be subject to review and revision does not prevent him from being characterized as exercising independent judgment and discretion"); *Young*, 2007 U.S. Dist. LEXIS 63566 at **12-13 (software engineer who was "given some direction" and "participate[d] in Code Reviews with her peers to review her solution" was nevertheless exempt administrative employee because she applied her own analysis and judgment in resolving defects); *Medepalli v. Maximus, Inc.*, No. CVS-06-2774 FCD EFB, 2008 WL 958045, *8 (E.D. Cal. Apr. 8, 2008) (holding that senior developer who asserted that he "had no control over the assignments he received or the end product" and "was subject to the direct supervision of his superiors, who reviewed his work and asked for modifications" nevertheless exercised independent discretion and judgment sufficient to qualify for exemption because "absolute discretion is not required" and the employee "did control the means by which to achieve [the requested] product").
[60] *See, e.g., Medepalli*, 2008 U.S. Dist. LEXIS 28509 at *23 ("Medepalli argues he did not exercise discretion… because he had no control over the assignments he received or the end product. … [B]ut he did control the means by which to achieve that product."); *see also*, Ramczyk Dec. ¶ 8.
[61] Foster Dep. (CA) 56:4-9 (WANDA did not tell him what to do); Donovan Dep. (CA) 107:17-21.

18

1   (B)(3)(a).  Even if they were, however, SLAs and OLAs have nothing to do with the job duties of

2   individual employees or the way that those job duties are performed.[62]   SLAs and OLAs merely

3   commit groups of employees to keep systems operational and available a certain percentage of the

4   time.[63]  The SLAs and OLAs have no impact on the individual job duties or discretion of employees

5   beyond setting these group numeric goals, and Plaintiffs have failed to show how the SLAs and

6   OLAs could serve as a common proof allowing for joint adjudication of exempt status.

7           **(v)**       **Monitoring of assignment completion has no relevance to exempt status**

8          Plaintiffs assert that WF's ticketing systems and SLAs allow WF to "track Class members'

9   performance."[64]  Tracking whether employees meet deadlines has no bearing on their exempt status.

10          **(vi)**    **Common timekeeping systems have no relevance to exempt status**

11         Plaintiffs identify the STAMP system, in which class members "enter the hours spent

12  performing various tasks," as an element of common proof.  Pl. Br. at 20.  Notwithstanding that

13  STAMP data may not exist across the class because not all technology employees use STAMP,[65]

14  Plaintiffs do not demonstrate how the exempt status of even a single person could be determined by

15  reviewing STAMP data.  STAMP is nothing more than an electronic filing cabinet in which certain

16  timekeeping information may be recorded,[66] and cannot constitute a common proof.

17          **(vii)**   **WF's treatment of employees as exempt or nonexempt by job title shows that joint adjudication of all 26 jobs is impossible**

18         Plaintiffs posit that the fact that WF does **not** treat all putative class members the same, but

19  rather classifies them as exempt or non-exempt based on job title, somehow constitutes common

20  proof supporting certification of mega-classes encompassing 26 jobs.  Pl. Br. at 19.  To the contrary,

21  the fact that WF assessed the exempt status of the various job titles separately, and treats them

22  differently for overtime purposes on the basis of that assessment, shows the exempt status of the 26

23  job titles cannot be jointly determined and that certification is impracticable.  Plaintiffs recognize

24  WF uses leveling guides to evaluate individual employees and to "put people properly in those levels

---

[62] Lindstrom Dep. 158:1-5; Prenevost Dep. (MN) 39:4-44:1; Tirumalasetty (CA) Dep. 76:14-78:6 (his understanding of SLAs is that they apply to vendors of WF); Sterns Dep. (CA) (rough) 88:8-22 (the SLA does not define or limit anything other than a deadline to complete work, and the deadline within the SLA may be negotiable).

[63] Lindstrom Dep. 42:5-7, 42:7-44:1

[64] Pl. Br. at 17-19.

[65] Thompson Dep. 30:10-14 (STAMP is not used by all employees in TOG)

[66] Thompson Dep. 18:6-16 (STAMP is used by technology employees for time reporting.)

1    **based on what they do**." *Id.* (emphasis Added).  WF also made **individualized** exemption

2    determinations with respect to many putative class members.  First Dougherty Dec. ¶¶ 2-12.  These

3    individualized determinations make clear that joint adjudication is not possible.  *Id.*

###      4.      A Class Adjudication Would Not Be Superior Because Hundreds, If Not Thousands, of Individualized Inquiries Are Required

5           Because the exempt status of the putative class members cannot be jointly adjudicated, a

6    class trial is not a superior method of trying this case.  Plaintiffs have not presented a plan by which

7    this case could be tried, instead suggesting the court could resort to "representative testimony

8    regarding Class members' daily duties," Pl. Br. at 22, a suggestion Judge Patel rejected in *In re*

9    *Wells Fargo* as without legal foundation.[67]  "[G]iven the plaintiff's predominance problems, the

10   court simply cannot certify a class.  Any trial would be consumed by individualized inquiries into

11   how each class member spent his or her day, making a class action no better than numerous

12   individual actions." *Id.* at *9.  The tens of thousands of dollars at issue in many individual claims,

13   Dougherty Dec. (*Russell*) ¶ 11, further renders individual adjudications a practicable solution.

14          An opt-out Rule 23 class action is also not superior because there is a pending opt-in FLSA

15   collective action.  "Though the Ninth Circuit has not reached the issue, district courts have found

16   opt-out state law classes to be incompatible with the FLSA's opt-in requirement." *Khadera v. ABM*

17   *Industries, Inc.*, 2010 WL 605308 at *4 (W.D. Wash. Feb. 19, 2010).[68]

### C.      The Proposed Statewide Classes Cannot Be Certified Under Rule 23(a) Because The Requirements of Commonality and Typicality Are Not Satisfied

19          **Commonality**.  Plaintiffs cannot establish the commonality requirement of Rule 23(a)(2) for

20   the same reason that predominance fails under Rule 23(b)(3).

21          **Typicality**.  Plaintiffs have not satisfied the typicality requirement of Rule 23(a)(3), which

22   requires the claims of a class representative "not differ significantly from the claims or defenses of

---

[67] *In re Wells Fargo*, 2010 WL 174329 at *8 ("representative testimony is typically only allowed in the unpaid overtime context to establish the number of hours employees worked and the amount they were paid, not whether a class of employees was exempt from the overtime laws' coverage").

[68] Certification of an opt-out Rule 23 class would likely require the court to exercise jurisdiction over a large number of individuals who have not asserted a federal claim, *id.*, and could also cause state law issues to substantially predominate in the litigation, *see, e.g., Edwards v. City of Long Beach*, 467 F. Supp. 2d 986, 992 (C.D. Cal. 2006), both of which would create substantial issues with respect to the court's supplemental jurisdiction over the state law claims.  An opt-out state law class also "raises concerns for individual litigants because of the possible res judicata implications of a class-wide resolution," which could thwart Congress's intent to preserve the right of individuals to elect whether and when to pursue their FLSA claims.  *Khadera*, 2010 WL 605308 at *5; *Leuthold v. Destination America, Inc.*, 224 F.R.D. 462, 469-70 (N.D. Cal. 2004).

20

the class as a whole." *In re Computer Memories*, 111 F.R.D. 675, 680 (N.D. Cal. 1986); *see also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  Plaintiff Schilling is the only named representative for the Proposed Minnesota Class, and Plaintiffs Cooper and Lewis are the only named representatives for the Proposed California Class.  Named Plaintiffs are all former WF employees, and thus have no interest in the classes' asserted claims for declaratory and injunctive relief.[69]  Furthermore, Named Plaintiffs all held the job position of Network Engineer 4, and their own evidence indicates they had vastly different job duties from most of the 25 other job titles they now seek to represent.[70]   Plaintiffs have **no opt-in Plaintiffs at all** to represent 2 of the jobs in California[71] and 13 of the jobs in Minnesota,[72] and **no supporting declarations at all** for 7 of the jobs in California[73] and 16 of the jobs in Minnesota.[74]   Where there are "innumerable variations" in the putative class members' experiences, then "there is no 'typical' claim or experience, certainly not

[69] *See, e.g., Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241, 250 (C.D. Cal. 2006) ("Plaintiffs are former employees and thus an injunction as to [the employer]'s behavior to current employees cannot be Plaintiffs' primary concern.").

[70] Plaintiff Schilling, for example, testified that 50-75% of her job involved crawling under desks and "plugging in" computer hardware, and that most of her work time was spent "in the field." Plaintiff Schilling Dep. 54:9-55:6, 96:3-9.  If true, Plaintiff Schilling cannot possibly fairly represent putative Minnesota class members who, for example, "monitor viruses and analyze the computer network."  J.H. Dec. (MN) ¶ 2.  Similarly, Plaintiffs Cooper and Lewis, who did not do any significant programming or supervisory work, cannot represent putative California class members who "design[] and writ[e] software" or who were "given a team of employees" that they "supervised and directed" and "had the authority to fire."  Alvarez Dec. (CA) ¶ 4; B.K. Dec. (MN) ¶ 4.  WF will assert computer programmer, executive exemption, and combination exemption defenses with respect to such employees that Plaintiffs Cooper and Lewis have no interest in disproving because they cannot apply to them. The Named Plaintiffs also admit lacking substantial knowledge of Wells Fargo's organizational structure and the day-to-day responsibilities of other employees outside of the small "teams" in which they worked.  Plaintiff Cooper Dep. (CA) 66:15-67:17, 86:19-87:15, 302:14-19; Plaintiff Schilling Dep. (MN) 21:8-23:7, 151:4-152:25; Plaintiff Lewis Dep. (CA) 206:14-208:6, 209:10-210:7.

[71] Computer Operations Analyst 2, Web Engineer 2.

[72] Computer Operations Analyst 2, Database Analyst 2, Database Analyst 3, Network Analyst 2, Operating Systems Analyst 2, Web Engineer 2, Web Engineer 3 in California.

[73] Computer Operations Analyst 2, Computer Operations Analyst 3, Computer Operations Analyst 4, Database Analyst 2, Information Security Analyst 2, Operating Systems Analyst 2, Systems QA Analyst 2, Systems QA analyst 3, Web Engineer 2, Web Engineer 3, Web Support Engineer 5, Web Support Engineer 6. [Furthermore, Plaintiffs' declarant in the Web Support Engineer 5 position is not a credible witness, as evidenced by his deposition admission that his own description of his "professional experience" on his resume reflected not experience he actually had, but activities he believed he could do.  Tirumalasetty Dep. (CA) 100:24-101:13, 118:25-120:19, 133:12-136:7.]

[74] Applications System Engineer 3, Computer Operations Analyst 2, Computer Operations Analyst 3, Computer Operations Analyst 4, Database Analyst 2, Database Analyst 3,  Information Security Analyst 2, Network Engineer 5, Operating Systems Analyst 2, operating Systems Engineer 6, Systems QA Analyst 2, Systems QA analyst 3, Web Engineer 2, Web Engineer 3, Web Support Engineer 5, Web Support Engineer 6.

21

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION - CASE NO. 08-2670 CW**

1  Plaintiff's experience, that can be extrapolated classwide." *Sanchez v. Wal Mart Stores, Inc.*, 2009

2  WL 1514435, *3 (E.D. Cal. May 28, 2009).

3       Finally, Named Plaintiffs are not typical of, and cannot fairly represent, those putative class

4  members who were reclassified, paid back wages, and executed releases of their claims.  The courts

5  have recognized that plaintiffs who have not released claims have interests that "significantly

6  diverge" from class members who have signed releases, and are therefore inadequate class

7  representatives of a class consisting of a large number of members who have released their claims.[75]

8  **D.   Plaintiffs' ERISA Claims Cannot Be Certified Under Rule 23(b)(1)(B).**

9       No notice, no opt-out mandatory Rule 23(b)(1)(B) classes are not available in actions to

10  recover money damages to ERISA-regulated retirement plan accounts.[76]  Plaintiffs seek to recover

11  damages to their individual Cash Balance Plan Accounts.[77]  The Supreme Court in *LaRue v.*

12  *DeWolff, Boberg & Assoc., Inc.*, 552 U.S. 248 (2008) concluded that ERISA section 502(a)(2)

13  authorizes actions to recover money damages to individual retirement plan accounts, *id.* at 256, thus

14  precluding 23(b)(1)(B) certification for such claims.[78]  Not one case cited by Plaintiffs comports

15  with the *LaRue* decision.  Each of the 23(b)(1)(B) decisions cited by Plaintiffs predate *LaRue*, are

16  cases where certification was not challenged[79] or are based on the *pre-LaRue* assumption that

17  fiduciary claims are brought on behalf of the plan, not individual plan accounts.[80]

18

---

19  [75] *Melong v. Micronesian* Claims *Comm'n*, 643 F.2d 10, 13, 15 (D.C.Cir.1980); (affirming denial of class certification where most class members executed releases); *Stewart v. Avon Products,* No. CV

20  A. 98-4135, 1999 WL 1038338 at *4-5 (E.D. Pa. 1999) (plaintiff who did not release claims was inadequate class representative where most proposed class members had signed releases); *Miller ex*

21  *re S.M. v. Board of Educ. Of Albuquerque*, 455 F.Supp.2d 1286, 1294 (D.N.M. 2006).

[76] Although pled in the Complaint, Plaintiffs do not ask the Court to certify the ERISA claims under

22  Rule 23(b)(1)(A), no doubt because the Ninth Circuit has foreclosed use of subsection (b)(1)(A) where, as here, the plaintiffs primarily seek monetary relief.  *See Zinser v. Accufix Research Inst.,*

23  *Inc.*, 253 F.3d 1180, 1193 (9th Cir. 2001).

[77] Plaintiffs confusingly assert the class includes Wells Fargo Cash Balance Plan members, but

24  thereafter refer to the Cash Balance Plan as the "401(k) Plan."  *See* SAC ¶¶ 12-13, 48, 103-04 and 109-12.

25  [78] Like plaintiffs here, Mr. LaRue mistakenly attempted to recover monetary damages to his retirement plan account under ERISA Section 502(a)(3) as a form of "restitution."  *LaRue*, 552 U.S.

26  at 251-53.

[79] *See Aguilar v. Melkonian Enters., Inc.,* 2007 WL 201180 (E.D. Cal. Jan. 24, 2007); *Specialty*

27  *Cabinets & Fixtures, Inc. v. Am. Equitable Life Ins. Co.,* 140 F.R.D. 474 (S.D. Ga. 1991); *Simpson v. Fireman's Fund Ins. Co.,* 231 F.R.D. 391, 396 (N.D. Cal. 2005); and *Diduck v. Kaszycki & Sons*

28  *Contractors, Inc.,* 737 F. Supp. 792, 799 n.10 (S.D.N.Y. 1990).
[80] *In re Syncor ERISA Litig.,* 227 F.R.D. 338, 346 (C.D. Cal. 2005); *Gruby v. Brady,* 838 F. Supp. 820, 828 (S.D.N.Y. 1993); and *Becher v. Long Island Lighting Co.,* 164 F.R.D. 144, 153 (E.D.N.Y. 1996).

22

1   Moreover, class actions are permitted under Rule 23(b)(1)(B) only if separate actions

2   "inescapably will alter the substance of the rights of others having similar claims." *McDonnell-*

3   *Douglas Corp. v. U.S. Dist. Court for the Centr. Dist. of Cal.*, 523 F.2d 1083, 1086 (9th Cir. 1975)

4   (citations omitted).[81]   Thus, subsection (b)(1)(B) is typically applied to ERISA claims only if "the

5   claims of all plaintiffs exceeded the assets of the defendant and hence to allow any group of

6   individuals to be fully compensated would impair the rights of those not in court." *Green v.*

7   *Occidental Petroleum, Corp.,* 541 F.2d 1335, 1340 n.9 (9th Cir. 1976).  Plaintiffs have not and

8   cannot present any evidence that Wells Fargo is such a financially-challenged "limited fund."[82]

9   **E.   Plaintiffs Did Not Allege Any Facts Supporting ERISA Rule 23(b)(3) Certification.**

10   Plaintiffs' ERISA class allegations are asserted only under subsections (b)(1) and (b)(2), and

11   allege no facts supporting (b)(3) certification.  (SAC ¶ 46.)  Argument in a legal brief is not a

12   substitute for properly amending a complaint.[83]   Moreover, each of the individual fact questions that

13   make Plaintiffs' overtime claims unsuitable for Rule 23(b)(3) certification apply with equal force to

14   Plaintiffs' derivative ERISA claims.  Individual fact questions will also arise whether each Plaintiff

15   exhausted the Plan's claims review procedure before filing suit.[84]

16   **F.   None Of Plaintiffs' Proposed Classes Can Be Certified Under Rule 23(b)(2)[85]**

17   In cases where monetary damages are sought, certification under Rule 23(b)(2) is appropriate

18

---

19   [81] The Supreme Court has cautioned that a class member's rights to notice and an opportunity to opt
20   out should be preserved whenever possible and has accordingly "counsel[ed] against adventurous
    application of Rule 23(b)(1)(B)."  *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 845 (1999); *see also In*
21   *re First Am. Corp.  ERISA Litig.,* 258 F.R.D. 610, 622 (C.D. Cal. 2009).
    [82] If Mr. Lewis individually sued WF for money damages suffered by his 401(k) plan account, that
22   suit would not prevent Mr. Cooper from bringing his own suit. If Mr. Lewis lost because he lacked
    evidence, that *determination* would not preclude Mr. Cooper from maintaining his own claim. Under
23   usual preclusion rules, the defeat of an individual participant's claim could not adversely affect the
    individual claims of others.  *In re First American,* 258 F.R.D. at 622, citing *Blonder-Tongue Lab.,*
24   *Inc. v. Univ. of Ill. Found.,* 402 U.S. 313, 329-30 (1971).  Since participants in individual account
    plans can bring actions for losses to their accounts, there is no risk that an action for damages by one
25   participant would have a preclusive effect on other participants.  *In re Computer Sci. Corp. ERISA*
    *Litigation,* Case No. 08-02398, 2008 U.S. Dist. LEXIS 109027 (C.D. Cal. Sept. 2, 2008).
26   [83] *See Batsakis v. Fed. Deposit Ins. Corp.,* 670 F. Supp. 749, 757-58 (W.D. Mich 1987); *Mogel v.*
    *UNUM,* 646 F. Supp. 2d 177, 185 (D. Mass. 2009).
27   [84] *LaRue,* 552 U.S. at 259 (Roberts J., concurring).  *See also Diaz v. United Agr. Employee Welfare*
    *Ben. Plan & Trust,* 50 F.3d 1478, 1483 (9th Cir. 1995).
28   [85] Plaintiffs suggest in a single sentence that their injunctive relief claims could be separately
    certified pursuant to Rule 23(c)(4), but cite no cases in which a court has found use of Rule 23(c)(4)
    appropriate for derivative injunctive claims in an overtime case.  The injunctive relief claims here
    depend on the same proofs as the damages claims, rendering use of Rule 23(c)(4) impracticable.

23

1   only when the principal claim is for injunctive relief, and monetary relief is incidental.[86] The

2   Complaint overwhelmingly seeks monetary damages for Plaintiffs' individual retirement plan

3   accounts,[87] and monetary damages for overtime,[88] rather than forward-looking injunctive relief.

4   Indeed, the named plaintiffs are former WF employees and cannot possibly benefit from injunctive

5   relief.  *In re Wells Fargo*, 527 F. Supp. 2d 1053, 1070 (N.D. Cal. 2007) ("in the employment

6   context, courts routinely deny class certification under Rule 23(b)(2) where the named plaintiffs are

7   former employees and therefore will not benefit from any injunctive relief.").[89]  In addition, where,

8   as here, an alleged ERISA breach consists of a procedural violation of ERISA requirements (SAC

9   ¶¶ 104-105), equitable relief such as the retroactive crediting of Plan benefits requested by Plaintiffs

10   has been afforded only where the procedural violation involves bad faith, active concealment or

11   fraud on the part of the fiduciary, which Plaintiffs have not alleged.[90]

12   **G.   Plaintiffs Are Not Entitled To Equitable Tolling**

13        Plaintiffs have failed to demonstrate any right to equitable tolling.  Plaintiffs' argument that

14   WF fraudulently induced class members to delay suing WF by securing releases fails for several

15   reasons.  First, many putative class members never signed releases,[91] and Plaintiffs' argument has no

---

16   [86] *See Molski v. Gleich*, 318 F.3d 937, 947 (9th Cir. 2003) ("to permit certification under [Rule
17   23(b)(2)], the claim for monetary damages must be secondary to the primary claim for injunctive or
     declaratory relief"); *Besinga v. United States*, 923 F.2d 133, 135 (9th Cir. 1991) ("Where individual
18   damages are sought, generally a class must be certified under 23(b)(3).")
     [87] The ERISA claims seek to require WF to make additional retirement plan contributions to
19   Plaintiffs' accounts.  "[A]lmost invariably…suits seeking (whether by judgment, injunction, or
     declaration) to compel the defendant to pay a sum of money to the plaintiff, are suits for 'money
20   damages,' as that phrase has traditionally been applied, since they seek no more than compensation
     for loss resulting from the defendants' breach of legal duty."  *Great-West Life & Annuity Ins. Co. v.*
21   *Knudson,* 534 U.S. 204, 210 (2002) (internal citations omitted).  A plaintiff can seek restitution in
     equity "ordinarily in the form of a constructive trust or an equitable lien, where money or property
22   identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds
     or property in the defendant's possession."  *Id.* at 213.  Here, plaintiffs do not claim defendants have
23   misappropriated monies from the retirement plan, nor do they claim retirement plan assets are in
     WF's possession, and it is settled law in the Ninth Circuit that until an employer pays employer
24   contributions over to an ERISA-regulated plan, the employer contributions do not become ERISA
     plan assets.  *Cline v. The Industrial Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1234 (9th Cir.
25   2000).  Rather, Plaintiffs contend they are contractually entitled to additional plan contributions from
     WF.  The kind of restitution Plaintiffs seek, therefore, is not equitable, but legal – the imposition of
26   personal liability on WF for additional plan contributions.  *Accord*, *Great-West,* 534 U.S. at 214.
     [88] *See, e.g., Jimenez*, 238 F.R.D. at 250 ("Plaintiffs are former employees and thus an injunction as
27   to Domino's behavior to current employees cannot be Plaintiffs' primary concern.  Rather, a
     damages award is their main interest."); *Mendoza*, 2010 WL 424679 at *10.
28   [89] *See also Maddock v. KB Homes, Inc.*, 248 F.R.D. 229, 239 (C.D. Cal. 2007).
     [90] *Varity Corp. v. Howe*, 516 U.S. 489, 515-516 (1996); *Peralta v. Hispanic Bus. Inc.* 419 F.3d 1064,
     1075-76 (9th Cir. 2005); *Mathews v. Chevron Corp.*, 362 F.3d 1172, 1183-85 (9th Cir. 2004).
     [91] *See, e.g.*, Donovan Dep. (CA), p. 166:3-5; Second Dougherty Decl. ¶3.

24

application to those who did not.  Second, the releases are effective as to non-FLSA claims, so there was no arguable fraud.[92]  Third, even the if this court determines some of the releases are not effective, there was no controlling authority to that effect at the time the releases were executed – Plaintiffs cite none – and thus there was no arguable misrepresentation that could trigger tolling.  *See Naton v. Bank of California*, 649 F.2d 691, 696 (9th Cir. 1981).  Finally, the releases on their face do not state any facts that could be construed as misrepresentations.  The rule suggested by Plaintiffs – that whenever an employer voluntarily pays backwages and secures a release, it commits fraud – has no support in the law, and would discourage employers from voluntarily providing backpay.

## V.    CONCLUSION

For the foregoing reasons, Wells Fargo respectfully requests that the Court deny Plaintiffs' Motion for Class Certification, as well as their request for equitable tolling.

Dated: March 18, 2010.                    WINSTON & STRAWN LLP

By:    */s/ Joan B. Tucker Fife*
                    Joan B. Tucker Fife
                    Attorneys for Defendant
                    WELLS FARGO BANK, N.A.

#635166v6

---

[92] *See, e.g., Leavitt v. Northwestern Bell Telephone Co.*, 921 F.2d 160, 162 (8th Cir. 1990) (ERISA claims); *Perez v. Uline, Inc.*, 157 Cal.App.4th 953, 958-61 (2007) (California overtime claims); *Somora v. Marriott Corp.*, 812 F. Supp. 917, 925 (D. Minn. 1993) (Minnesota termination claims).

25

**DEFENDANT'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION - CASE NO. 08-2670 CW**